AMERICAN SEWAGE DISPOSAL CO. v. CITY OF PAWTUCKET.

(Circuit Court of Appeals, First Circuit.  June 13, 1905.)

No. 564.

PATENTS—INFRINGEMENT—SEWAGE APPARATUS.

The Glover patent, No. 559,522, for a sewage apparatus comprising a series of stationary primary filter-beds having a structure inclosing the same, and a series of secondary filter-beds open to the air, does not include as an element of the combination a septic tank, nor do the primary filter-beds operate on the principle of septic or putrefactive action, to liquefy the sewage, but of sedimentation and filtration.  As so construed, *held* not infringed by an apparatus using a septic tank.

Appeal from the Circuit Court of the United States for the District of Rhode Island.

For opinion below, see 132 Fed. 35.

Edward P. Payson, for appellant.

William R. Tillinghast (Edward W. Blodgett, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

COLT, Circuit Judge. This appeal relates to the Glover patent, No. 559,522, issued May 5, 1896, for improvements in sewage apparatus. The Circuit Court dismissed the bill on the ground of noninfringement. The Glover apparatus comprises a series of primary filter-beds, a structure inclosing these beds, and a series of secondary filter-beds located outside the structure. The patent also describes a settling tank, from which the liquid and sludge may be drawn off onto the primary filter-beds. This tank, however, is not claimed as a part of the invention covered by the patent.

The single claim of the patent reads as follows:

"A sewage apparatus comprising a series of stationary primary filter-beds, a structure over said beds with provision for the removal of offensive gases therefrom, and a series of stationary secondary filter-beds located outside the said structure and arranged to receive by gravitation the effluent from the primary filter-beds, the said primary beds being constructed to discharge the effluent wholly through filtering material, whereby the offensive matter is retained in the structure and the effluent is clarified and partially purified, and whereby the said effluent may receive subsequent treatment in the open air by extensive secondary beds for any required length of time without offense."

The validity of the Glover patent has not been attacked, the counsel confining their argument to the question of infringement. Upon this question the case resolves itself into a single sharply-defined issue. Was Glover the inventor of the septic tank, and has he embodied this tank in the patented apparatus? More specifically stated, the issue is narrowed down to the proposition: Are what are termed "primary filter-beds" in the patent in fact septic tanks? The defendant's plant as now operated uses septic tanks, or a septic tank, and if, in the sense of the Glover patent, primary filter-beds signify septic tanks, the defendant infringes; otherwise there is no infringement, and the bill must be dismissed.

The complainant's position may be summarized as follows: The modern and most perfect system for the disposal of municipal sewage comprises the combination of putrefactive or septic tanks and filtering-beds. The first step decomposes the crude sewage into liquid and gases by septic action. The second step purifies the effluent by oxidation. Glover discovered the septic tank in 1880, and took out a patent for it in 1882. This was his great invention, but the system was incomplete. The complete invention is covered by the patent in suit, in which there is found the combination of septic tanks and filter-beds. It is not claimed that Glover had any scientific knowledge of putrefactive or anaërobic bacteria, or of the putrefactive process or method; but it is maintained that he discovered the septic tank as a structure, that his 1882 patent is for this structure, and that the patent in suit includes this structure as the first and primary element of his perfected invention. It is further

contended that, although the primary filter-beds of the patent in suit contain filtering material, they are, and were intended to be, in their structure and mode of operation, septic tanks. It is also urged that, if the meaning of "primary filter-beds" is not entirely clear on the face of the patent, the court should give them such an interpretation as to save the actual invention, since Glover was the first to discover the utility of the septic tank in the disposal of sewage.

The defendant's answer to this position is that the patent in suit actually covers, and was only intended to cover, a system of rapid intermittent filtration, comprising two series of filter-beds—the primary filter-beds, which are under cover, and the secondary filter-beds, which are outside the structure.

To determine whether Glover invented the septic tank, which is the fundamental question in this case, it is necessary to have some clear comprehension of the meaning of the terms "septic tank" and "septic action" in the sewage art.

The best and most satisfactory source of information on this subject is the documentary evidence in the record, from which it will prove helpful if we quote quite fully.

The term "septic" appears for the first time in the Cameron British patent of 1896, 16 years after Glover made his alleged discovery of the septic tank, and 14 years after he took out his first patent. The Cameron patent clearly describes the septic tank and the septic process. The specification says:

"This invention relates to the treatment of sewage and to apparatus therefor, and has for its principal object to deal with crude sewage bacteriologically and bring it into such a condition of solution and liquefaction that it can be treated by filtration or irrigation, or in any other suitable way.

"By this invention further it is possible to get rid of the sludge difficulty, because the solid portion of crude sewage is entirely thrown into solution.

"In the systems now employed the crudge sewage is first treated chemically, so that the solid matter is to a great extent precipitated and it is only the liquid part which is treated by filtration or otherwise.

"By this invention the chemical treatment is entirely dispensed with, and, further, the expense of dealing with the precipitated matter is also obviated. In previous systems it has been considered of advantage that there should be contact of sewage matter with the air. In the treatment of sewage according to our invention it is of the utmost importance that the chamber in which the bacteriological action takes place should be dark, and also that means should be provided for preventing contact with the air. This want of contact with the air can be arranged by providing a closed cover to the tank or vessel or in certain cases by having no cover, but by utilizing the formation of scum which occurs when sewage is treated according to this invention. In carrying out this invention we provide or construct a tank of concrete, brick, or other suitable material, preferably shallow compared to its other dimensions. In order to insure exclusion of air, we make the cover air-tight and the manhole solid and air-tight. It may be found desirable to have a valve in the manhole to allow at times of the escape of gas should the fermentation or bacteriological action take place too rapidly. The inlet pipe and outlet pipe into the tank should be preferably trapped. The inlet pipe should be so arranged that it discharges into the tank some two or three inches below the normal surface of the water so as to avoid breaking the scum which forms. For the same reason the outlet pipe should be from the top of the tank, but trapped, and carried down below the surface, so that the floating matter is retained in the tank. The bottom of the tank may be pro-

vided with a small channel, or it may be dished so that the mineral or other insoluble matter may be collected there and taken out as required.

"We have found by experiment that the tank should be of a capacity to hold about 20 gallons per head of population, but we do not bind ourselves to this. After such a tank has been for 2 or 3 days in operation, a brown scum forms at the top, and eventually becomes 2 or 3 inches in thickness. This scum is formed by bacteriological action, and rises in particles from the bottom of the tank; gas forming at the bottom and carrying these small particles with it to the top of the tank. After such a tank has been in operation for 2 or 3 days, the effluent is satisfactory, and is in a condition to be further treated by any other means; such, for example, as a coke-breeze filter."

"It is not absolutely necessary for the tank to have an air-tight cover, as above described, because the dark scum which forms serves to keep both light and air from the sewage, but we consider it important to provide the cover."

The reports of the Massachusetts State Board of Health for the years 1898 and 1899 throw further light on this subject:

### "Septic Tank System.

"The processes by which the percentage of suspended organic matter can be reduced are now being taken advantage of by the so-called septic tank system (first in operation in Exeter, Eng.), the main feature of which is an air-tight tank into which the sewage passes, to be retained for a time in order to allow the bacteria of decomposition, and subsequently those of putrefaction, to break up the organic matters into simpler forms.

"During the year we have studied this method with very interesting results. An air-tight wooden tank, divided into two compartments by a partition midway in the tank, has been used as a septic tank. The sewage flows into one compartment, and over this partition into the other, from which it is withdrawn by means of a faucet midway between the top and bottom of the side of the tank. Thus we avoid drawing out either the sediment from the bottom of the tank or the fat and fatty matters which accumulate upon the surface of the sewage. The sewage remains in the tank from twenty-four to thirty-six hours, and the tank is always kept full, sewage being run into the tank when any is withdrawn, and at the same rate.

"The sewage, when drawn from the tank, is generally of an exceedingly offensive odor, and darker colored than when it enters, but always clearer than ordinary sewage."

### "Septic Tanks Need not be Air-Tight; Neither Need Light be Excluded.

"It was stated in the last report that it appeared to be doubtful if it was necessary to have a septic tank air-tight, and also doubtful if it was necessary to exclude light. During the year two small septic tanks were operated for several months, one being open to the air and light, and the other air-tight and covered.

"In the case of the open tank, it can be said that a phenomenon took place that prevented the access of air to the sewage in the tank, and excluded the light almost as thoroughly as if care had been taken in the first place to make the tank air-tight and to exclude the light; that is, a thick scum of fats and bacterial growths formed over the surface of the sewage. This same result has been obtained on a large scale more recently at Manchester, Eng., where it is proposed to utilize hereafter as septic tanks the already constructed open chemical precipitation tanks in the new scheme of treatment of the sewage of that city."

A still earlier description of the septic tank and septic process is found in the Mouras French patent of September 22, 1881, and the Mouras American patent, No. 268,120, bearing date November 28, 1882

After reciting the methods then in use for cleaning cesspools, the specification of the French patent says:

### "THE AUTOMATIC AND ODORLESS SCAVENGER.

#### "Description of the Apparatus.

"This apparatus of extreme simplicity is composed firstly of three agents, viz.:

"1. An air-tight tank, hermetically closed, of a capacity in proportion to the needs it is to satisfy.

"2. A feed pipe, B, sealed to the top of the tank, and destined to receive evacuations, slops, and rain water.

"3. An elbow pipe, C, likewise fastened to the upper part of the tank, and serving to discharge the sewerage contained in the tank.

"The feed pipe, B, as well as the discharge pipe, C, both well sealed, are to plunge from 10 to 15 centimetres into the liquid in the tank. This is what closes it hermetically.

#### "Construction of the Tank, the Scavenger.

"The tank, the scavenger, may be constructed in all kinds of forms and of all kinds of materials. For small households, which wish to practice economy, it may be reduced to a simple sheet-iron cask placed anywhere, provided that this cask is furnished with a receiving pipe and a discharge pipe communicating with a sewer pipe.

"Our tank being easy and inexpensive to construct, the owner or architect may place it anywhere in the house, even in the narrowest closet. Besides, as it is odorless, cesspools may be established even in the interior of the rooms without the least inconvenience.

"The first condition to fulfill in the construction of this tank is to leave it perfectly air-tight.

"Its covering may, at will, consist of slabs or of a masonwork arch, of bricks, of concrete, cement, or any other material; but it should be made so that in no case the outer air can get into this tank, which, to be protected from changes in temperature, should always be hermetically closed. This is the second condition to fulfill.

#### "Mode of Operation of the Tank.

"The tank, A, does not begin to operate until it is completely full of water. If then there is let in through the receiving pipe, B, any volume whatever of water or fæces, immediately an equal volume of water is expelled by the discharge pipe, C, sealed at the upper part of the tank.

"But we must carefully note that the discharge pipe never passes anything but a turbid water holding in dissolution a certain quantity of matter coming from the decomposition and disaggregation of matter going on at the bottom of the tank.

"For the proper working of the apparatus it is expedient to discharge into the receiving pipe, as much as possible, rain water and dish water, in short all water that can be disposed of, in order to facilitate in the tank the decomposition and disaggregation of fæces and all other decomposable matters which may chance to be there.

"The tank constructed as we have just said, there can be no escaping of gas, no emanation whatever, either by the tank, A, which is air-tight, and hermetically closed, or by the feed pipe, B, which plunges into the water to the depth of 10 to 15 centimetres."

"Under ordinary normal conditions the tank always acts as we have just said. However, there is a case, but a very exceptional one, in which the tank will be unable to perform its functions, and that is when, in the long run, in consequence of the carelessness of negligent servants, the tank will be completely filled by the accumulation of foreign substances, such as bones, broken dishes, and kitchen refuse of all kinds which shall have been thrown into it through the reservoirs. It is incontestable that in such a case the owner, to clean out his tank, will be obliged to use the ordinary means of cleaning. But, we repeat, this will be an exception, and nothing but an ex·

ception. Furthermore, even in the very unfavorable supposition which we have just foreseen, it is only after a very long lapse of time—a century perhaps—that there will be occasion to clean out the tank.

"In any other case, one will never be obliged to open the tank and summons the nightman. and we say so with this certitude and assurance furnished by the twenty years' experience, during which time the system has never failed to perform its functions with the greatest success in the home of the inventor."

"To conclude, we will say that our system is far from being one of those experiments more theoretical than practical, which await the sanction of experience; but that, on the contrary, it has shown what it can do. The twenty years during which it has worked with the greatest success in the house of the inventor testify clearly that the tank, the scavenger, is one of those serious inventions of general utility which have only to be produced to be immediately accepted and sought after by the public."

In commenting on the Mouras invention, M. Moigno, in the Cosmos des Mondes for December 21, 1881, and January 21, 1882, says:

"I had been prepared for a long time, by personal observation, to accept and explain to myself in a sufficiently satisfactory manner the incredible facts M. Mouras has been in possession of for twenty years."

"The automatic scavenger is, in fact, first, hermetically sealed and closed by the most inviolable of fastenings, hydraulic fastenings; that is to say. its contents is cut off from all contact with the surrounding atmosphere. For that very reason, second, it is absolutely odorless, and renders all infection impossible. Third. By a mysterious operation, and one which reveals a quite new principle, it transforms all it receives. solid and liquid excrements, in a rather short space of time, and without addition of chemical ingredients, into a homogeneous liquid, only slightly turbid, and holding everything in suspension in the form of scarcely visible filaments, without leaving any deposits on the sides of the evacuation pipe or at the bottom of the drain pipe. Fourth. It empties itself automatically and continuously; that is to say, each volume of new evacuations introduced by the feed pipe immediately drives out an equal volume of old evacuations worked over and fluidized. Fifth. The liquid which escapes, while it contains all the organic and inorganic elements of the evacuation, is almost odorless, and may be received on the spot into a watering cart for agricultural purposes, or may flow away of itself into the branch pipe at first, then into the street sewer, then into the main sewer, and at last into canals for irrigation of prairies, fields, forests, etc."

Respecting septic action, it was said before the English Society of Arts in 1886:

"During spontaneous subsidence, which is a much slower process than precipitation, fermentation sets in. Solids are converted into liquids, and both solids and liquids into gases."

On the same subject, M. Moigno wrote in January, 1882:

"The mysterious agents of fermentation causing the decomposition and liquefaction of the fæces are the vibrions or anaërobic bacteria which, according to Pasteur, are destroyed by oxygen, and which manifest their destructive activity only in vessels from which the air is excluded."

From the foregoing descriptions it appears that the fundamental condition which characterizes the septic tank, and which differentiates it from the ordinary settling tank, is that the sewage shall remain in the tank for a considerable period of time in order that the bacteria of putrefaction may manifest their destructive activity, and so accomplish their work of decomposition and liquefaction.

The second essential condition which marks the septic tank is

that the contents of the tank must either be practically cut off from all contact with the atmosphere, or the surface of the sewage must remain quiescent for a sufficient length of time to permit the accumulation of a thick scum on the top, which operates to exclude the air and light. In other words, the tank must be built either airtight, or so constructed with respect to its inlet and outlet pipes that the brown scum may be allowed to form on the exposed top surface. The necessary absence of air from the tank is due to the fact that the bacteria of putrefaction are destroyed by oxygen.

We are now prepared to consider Glover's earlier patent, which, it is contended, discloses his great discovery of the septic tank. This patent is numbered 258,744, and was issued May 30, 1882. The specification says:

"This invention has for its object to enable sewage matter to be disposed of without danger of contaminating the soil by matter in suspension, or the air by gases and odors.

"The invention consists, first, in the combination of a series of tanks, a sewer main or pipe arranged to discharge sewage matter into the first tank of the series, from which said matter flows successively through the other tanks; a building or inclosure over said tanks, having an inclined roof forming a flue, having an opening at its lower end for the admission of external air, and a chimney connected to the upper end of said roof or flue; said chimney, flue, and opening causing a current of air to pass over the series of tanks to the chimney and carry with it from the building all the gases and odors arising from the matter in the tanks.

"The invention also consists in an apparatus or building for the disposal of sewage, composed of, first, a central structure, receiving a sewer main, and provided with a ventilating flue or chimney; and, secondly, a series of radiating wings or inclosures, each having a series of tanks adapted to receive sewage matter from the central structure, and an inclined roof or flue communicating with the central chimney, and adapted to conduct to the chimney the gases and odors from the sewage matter in the tanks. Each wing is separated from the other wings, and means are provided for shutting off the sewage from either of the wings, so that when the tanks in either wing require cleaning out the work can be done without stopping the operation of the tanks in the other wings; all of which I will now proceed to describe."

"In carrying out my invention I construct a chimney, A, of sufficient height to create a strong upward draught and carry gases and odors from sewage to a sufficient height to prevent them from being offensive. Around the base of said chimney I construct a building, B, into which, at its base, enters a main sewer pipe, C. Around the building, B, are a series of radiating buildings or wings, D, of any desired number. The main sewer-pipe, C, has several branches, E—one for each wing, D. Each wing has a series of tanks, F, of any desired number, and the branch pipe, E, of each wing, is arranged to discharge sewage matter from the main pipe into the first tank, F, from which the sewage overflows into the succeeding tanks, the same water flowing through all the tanks in the series until it reaches the outer end of the wing, and depositing in each tank a portion of the matter held in suspension until it is comparatively free from such matter, and passes out from the last tank to the ground, or to a suitable conduit, in a practically pure condition. The roof of each wing, D, is inclined upwardly from the outer end to the main building and communicates with the chimney, A, as shown in Fig. 2, so that it constitutes an inclined flue, which conducts all gases and odors from the sewage matter in the tanks to the chimney. Each wing, D, is provided with an opening, H, at its outer end under the roof to permit the entrance of air to facilitate the passage of the gases and odors to the chimney, otherwise the wings are made as nearly air-tight as possible. The branches, E, which conduct the sewage matter to the wings, D, are provided with suitable valves or gates, I, so that the flow of sewage to either wing can be shut off when

it is desired to remove the deposits of solid matter from the tanks of such wing. In practice, when the described works are constructed on a large scale, capable of disposing of the sewage of a city or town, the wings will be shut off one at a time to be cleaned, the disposal of sewage going on at the same time in the other wings. Each wing is provided with doors, K, for the removal of the matter from the tanks."

"I am aware that sewage has been caused to flow through a series of tanks, depositing in each a portion of the matter held in suspension; but I am not aware that such tanks have ever been covered by a structure having an inclined roof or flue leading to a chimney, whereby all offensive odors and noxious gases are sufficiently removed as to be harmless.

"I claim as my invention—

"1. In an apparatus for the disposal of sewage, the combination of a series of tanks, a sewer main or pipe arranged to discharge sewage matter into the first tank of the series, from which said matter flows successively through the other tanks, a building or inclosure over said tanks, having an inclined roof forming a flue having an opening, H, at its lower end for the admission of external air, and a chimney, A, connected to the upper end of said roof or flue, said chimney, flue, and opening causing a current of air to pass over the series of tanks to the chimney and carry with it from the building all the gases and odors arising from the matter in the tanks, as set forth.

"2. The improved apparatus or building for the disposal of sewage, consisting of, first, a central structure receiving a sewer main, and provided with a ventilating flue or chimney; and, secondly, radiating wings or inclosures, each having a series of tanks adapted to receive sewage matter from the central structure, and an inclined roof or flue communicating with the central chimney and adapted to conduct to the chimney the gases and odors from the sewage matter in the tanks, the central structure being provided with means for shutting off the sewage from either of the wings whenever the tanks require cleaning, as set forth."

Upon its face this patent covers a series of settling tanks in combination with a ventilating structure over the tanks, which causes "a current of air to pass over the series of tanks," and carry with it the gases and odors arising therefrom. The patent expressly declares that the invention is found in the building and chimney for carrying away the gases and odors, and not in the tanks. The patentee says that he is "aware that sewage has been caused to flow through a series of tanks, depositing in each a portion of the matter held in suspension," but he is "not aware that such tanks have ever been covered by a structure having an inclined roof or flue leading to a chimney, whereby all offensive odors and obnoxious gases are sufficiently removed as to be harmless." This statement is totally inconsistent with the idea that there was anything novel in the construction or mode of operation of the tanks, and with any intention on Glover's part to patent a septic tank as distinguished from a settling tank.

The ventilating structure of this patent does not show that Glover had any comprehension of septic action, or of the essential conditions which enter into a septic tank. At this time the scientific distinction between sedimentation and septic action was not generally understood, and it was the popular impression that settling tanks emitted odors and gases, which should be disposed of in some way without danger of contamination therefrom.

Further, these tanks, both in description and mode of operation, are wanting in the primal characteristics of septic tanks. There is nothing in the patent which indicates that the sewage is to remain

in the tanks long enough to cause liquefaction by the septic process. On the contrary, the specification says that in practice the "wings" may be shut off one at a time in order to be cleaned. Again, the portion or quantity of the matter held in suspension which would be deposited in each tank would depend upon the rate and quantity of the flow, and whether it was continuous, and the patent is silent on these important subjects.

The second vital condition inherent in a septic tank is likewise absent from these tanks, namely, the exclusion of the air. The patent expressly provides that a current of air shall pass over the tanks. It further expressly provides that the sewage shall overflow from the first tank into the succeeding tanks. We have, then, in these tanks neither the total exclusion of the air from the sewage, nor, in the alternative, such an undisturbed condition of the surface of the sewage as will permit the formation of the thick scum which operates to shut out the air. Since, according to Pasteur and other scientists, the presence of oxygen destroys the activity of putrefactive bacteria, it is manifest that the Glover tanks would not operate, in any proper sense, as true septic tanks.

It may be observed in this connection that in the ordinary settling tank the line between sedimentation and septic action cannot be strictly drawn, for, if any portion of the sewage is permitted to remain for a considerable time in such a tank, there will be more or less fermentation, and this would be true of the Glover tanks. The question, however, is not whether there may not be some septic action in these tanks, as there may be in all settling tanks; but whether this patent discloses, or was intended to disclose, the practical septic tank of the sewage art for the disposal of sewage by the septic process.

For these reasons we fail to find in this earlier Glover patent any intention to patent a septic tank, or any description of such a tank within the meaning of the patent law.

Thirteen years after the issue of his first patent, Glover filed his application for the patent in suit. The literature of the art shows that during this time those interested in the subject, both from a scientific and a practical standpoint, were directing their efforts largely to intermittent filtration as affording the best solution of the sewage problem. We think it appears from this later patent that Glover's mind ran in the same direction, and that he believed that the best system of sewage was to be found in two series of filter-beds combined with substantially the ventilating structure of his first patent. The only part of this later apparatus which, on the face of the patent, is like the tanks of his first patent, is what is described as a "settling tank," which is not shown in the drawings nor included in the claim of the patent.

The patent reads as follows:

"This invention has for its object to permit the filtration of sewage on a large scale without making the same offensive; and it consists in an apparatus comprising a series of primary filter-beds and means for charging the same with sewage, a structure inclosing said primary beds and having provision for the removal of the gases emanating therefrom, the said primary

beds being constructed to separate the solid from the liquid matter and to discharge the effluent wholly through filtering material, and a series of secondary filter-beds located outside the said structure and arranged to receive said effluent by gravitation and adapted to complete the purification of the same, the effluent being clarified and sufficiently purified and deprived of offensive matter by the primary filter-beds to permit its treatment by the secondary beds in the open air without offense.

"Of the accompanying drawings, forming a part of this specification, Fig. 1 represents a vertical section of one form of sewage apparatus embodying my invention. Fig. 2 represents a section on line 2, 2, of Fig. 1, and a plan of the parts below said line. Fig. 3 represents a vertical section of another form of apparatus.

"The same letters of reference indicate the same parts in all the figures.

"In the drawings, a, a, a, represent a series of primary filter-beds, which are inclosed in a structure having provision, such as a chimney, $b^1$, for the removal of gases emanating from the filter-beds; a.

"The sewage may be first deposited in a settling-tank, which may be within the structure, b, or elsewhere, and after sedimentation or chemical precipitation in said tank the liquid and the sludge may be drawn off onto the primary filter-beds.

"I have not shown the settling-tank in the drawings, but it may be supposed to be below the floor of the structure, b, and connected with pipe, c, through which the sewage may be transferred to the primary filter-beds.

"d, d, d, represent a series of secondary filter-beds located at the outer ends of the primary beds and at a lower level, so that the effluent from the primary beds will flow by gravitation upon the secondary beds.

"The primary beds are constructed to arrest the solid matter and permit the escape of the liquid matter wholly through filtering material onto the secondary beds, so that the effluent will contain comparatively little offensive matter. The primary beds may be of any suitable construction to accomplish this end. For example, they may have water-tight bottoms of concrete and a series of porous pipes, e, disposed upon the said bottoms and converging to an outlet-pipe, f, as shown in Figs. 1 and 2, the walls of said pipes, e, constituting the filtering material. The pipes, e, have no direct communication with the spaces inclosed by the walls of the primary beds and the effluent enters said pipes only through the porous wall of the pipes, which may be of unglazed earthenware.

"In Fig. 3 I show primary filter-beds, $a^1$, composed of filtering material, such as sand and gravel or any of the materials used for such purposes, resting on a liquid-tight concrete bottom, $a^2$. An outlet-pipe, $f^2$, communicates with the filter-bed and receives the effluent therefrom and delivers it to the corresponding secondary bed.

"The secondary beds are located outside of the structure, b, and may be of any desired size and construction. They are here shown as provided with sluices, or passages, g, which receive the effluent from the outlet-pipes, f, and have lateral outlets, $g^1$, through which the effluent passes in numerous small streams to filtering-surfaces.

"It will be seen that the sewage matter is separated in the primary beds into two parts, the offensive matter being retained in the gas-removing structure, where it may be composted with ashes, loam, or sand, and removed without offense, while the effluent is clarified and partially purified by being deprived of the greater part of the offensive matter, so that it may be rapidly disposed of in the open air by the secondary beds without being a source of offense. The secondary beds should be of much larger area than the primary beds, so that they can dispose of all the effluent that can possibly flow from the primary beds.

"The fact that the secondary beds are much larger than the primary beds is indicated in the drawings, in which the outer ends of the secondary beds are shown as broken away, this being due to the limitations imposed by the size of the drawing-sheet.

"I prefer to provide seven or more of the primary beds and an equal number of secondary beds, each primary bed and the accompanying secondary bed being of sufficient capacity to dispose of one day's sewage. The solid matter

deposited in the primary beds may be removed from time to time in any suitable way.

"It is to be understood that in practice the outer ends of the sluices, g, are closed or of such height that the effluent can escape therefrom only through the outlets, $g^1$, to the beds, d, d.

"The general construction of the entire apparatus is such that while the primary filtration takes place in a structure adapted to remove offensive gases, the secondary treatment, being in the open air, may extend for such length of time or over such an area of secondary beds as to completely dispose of the sewage.

"I claim—

"A sewage apparatus comprising a series of stationary primary filter-beds, a structure over said beds with provision for the removal of offensive gases therefrom, and a series of stationary secondary filter-beds located outside the said structure and arranged to receive by gravitation the effluent from the primary filter-beds, the said primary beds being constructed to discharge the effluent wholly through filtering material, whereby the offensive matter is retained in the structure and the effluent is clarified and partially purified, and whereby the said effluent may receive subsequent treatment in the open air by extensive secondary beds for any required length of time without offense."

This patent must be read in connection with the prior proceedings in the Patent Office.

The claim of the original application was rejected on the prior Black patent, No. 450,094, the Patent Office saying, among other things:

"No reason has been alleged why the material should be subjected to a double filtration, nor why the material should choose to pass through the lateral passages, $g^1$, in place of traveling in a straight line."

In reply to this communication, Glover's solicitors wrote:

"The reason for double filtration now seems to be clear. The material passes through the lateral passages, $g^1$, just as it would through holes made in the bank of a canal below the water line."

The claim was again rejected on the Black patent and the prior Glover patent. In reply to this second communication, the solicitors wrote:

"The general construction of the entire apparatus is such that while the primary filtration takes place in a structure adapted to remove offensive gases, the secondary treatment, being in the open air, may extend for such length of time or over such an area of secondary beds, as to completely dispose of the sewage."

Also:

"In an apparatus capable of disposing of any considerable quantity of sewage, it would be impracticable to provide a structure extending over filter-beds of sufficient area to quickly and thoroughly dispose of it.

"The applicant has provided apparatus which permits inoffensive filtration over any desired area or for any necessary length of time."

The claim was a third time rejected, the Patent Office saying:

"In view of the fact that it is old to provide stationary filtering beds with a structure extending over all the beds, as shown in applicant's patent No. 258,744, there is certainly no invention in now providing a part of the filters with a part without such structures. This would appear to be a retrogression in the art."

In reply to this communication, the solicitors wrote the following letter, setting out the system covered by the patent and how it dif-

fers from the first Glover patent. It was upon the strength of the representations made in this letter that the patent was finally passed to issue:

"The Glover system provides a series of primary filter-beds through which the sewage is allowed to pass by filtration there being a separate bed for each day's sewage so that the filtration may be intermittent. Provision is made for the working of this system throughout the year by covering the primary filter-beds with a roof and the ventilation of the sewage by a forced draught.

"The primary filter-beds being protected by a building, can be cared for and renewed at all seasons and will not become a nuisance in any neighborhood.

"The effluent is partially purified and wholly clarified by the primary filter-beds, and flows therefrom to a series of out of door or secondary filter-beds where it is distributed by a series of overdrains. These secondary filter-beds provide for the further purification of the sewage.

"After the sewage has been clarified and partially purified by the rapid intermittent filtration through the primary filter-beds, so much of the impurities will be found to have been removed that an acre of secondary filter-beds will probably purify from 300,000 to 500,000 gallons daily, whereas without the preliminary purification afforded by the primary filter-beds, a much greater area would be required in the secondary filter-beds.

"The above facts are obtained from an article in the Boston Herald of October 4, 1895, by John N. McClintock, of Boston, a civil engineer.

"The same article contains the following description of experiments made with the Glover system at Lawrence, Mass.:

" 'The partially purified and wholly clarified effluent from the covered filter-beds is carried to a series of out-of-door filter-beds where it is distributed by a series of overdrains, thoroughly ventilated, under a cover of loam. These out-of-door filter-beds are thoroughly underdrained and provide for the further purification of the sewage, allowing an acre for the purification of a 100,000 gallons of sewage daily.

" 'After the sewage has been clarified by sedimentation in the tanks, and purified by rapid, intermittent filtration through the first filter-beds, so much of the impurities will be found to have been removed that an acre will probably purify from 300,000 to 500,000 gallons daily.'

"We give the foregoing to show the importance of applicant's invention and that it is not retrogression in the art as implied by the last Office letter.

"Applicant's former patent, 258,744, does not show filter-beds. It contains simply a series of tanks in which the sewage is acted on only by sedimentation. The effluent leaves the structure without being clarified by filtration.

"The apparatus shown in said patent does not therefore show the construction now claimed nor an equivalent thereof, lacking as it does, the two series of filter-beds."

When we read in this patent of "primary filter-beds" in connection with the statement in this last letter to the Patent Office:

"Applicant's former patent, 258,744, does not show filter-beds. It contains simply a series of tanks in which the sewage is acted on only by sedimentation. The effluent leaves the structure without being clarified by filtration. The apparatus shown in said patent does not therefore show the construction now claimed nor an equivalent thereof, lacking as it does the two series of filter-beds."

—No other rational conclusion can be reached than that primary filter-beds mean primary filtering receptacles; and these receptacles cannot, upon any possible rule of construction, be interpreted to signify septic tanks. It is inconceivable that Glover should have disclosed septic tanks in his earlier patent, and then have intended to incorporate these tanks into the patent in suit under the name "primary filter-beds"; and this in the face of the fact that he ex-

pressly says that his earlier tanks are not made a part of this patent.

It is possible there may be some septic action in this filtering-bed receptacle, just as there may be some action of this character in the ordinary settling-tank. This, however, is immaterial, the question being whether these beds were intended to operate as septic tanks.

Upon full consideration of the whole case, we find that the first Glover patent does not disclose the septic tank, and that the second Glover patent is for a system of rapid filtration, comprising two series of filter-beds, one inside the ventilated structure and the other outside. It follows that the defendant's apparatus does not infringe the Glover patent in suit by using a septic tank or septic tanks in combination with filtering beds.

The decree of the Circuit Court is affirmed, and the appellee recovers costs of appeal.