CAMERON SEPTIC TANK CO. v. VILLAGE OF SARATOGA SPRINGS et al.

(Circuit Court of Appeals, Second Circuit. January 7, 1908. On Rehearing, February 7, 1908.)

No. 81.

PATENTS—INVENTION—PROCESS AND APPARATUS FOR TREATING SEWAGE.

The Cameron, Commin and Martin patent No. 634,423, for a process of and apparatus for treating sewage as to the process claims, the essential feature of which is the securing of the separate and successive action of anaërobes and aërobes on the organic matter of the solids in a flowing current of sewage by secluding it before its passage into the aërating tanks in a septic tank, where it is excluded from light, air, and agitation until by the anaërobic action generated therein all organic matter is dissolved and the entire current liquefied, was not anticipated and discloses patentable invention in the discovery and utilization of a process of nature for a practical purpose. The apparatus claims, which cover the construction and arrangement of the series of tanks, disclose nothing broadly new and are void for lack of novelty. The process claims also held infringed.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This cause comes here upon appeal from a decree of the United States Circuit Court, Northern District of New York, dismissing a bill for infringement of United States patent No. 634,423, granted October 3, 1899 (on application filed March 15, 1897), to Donald Cameron and others for "Process of and Apparatus for Treating Sewage." The opinion of the Circuit Court is found in 151 Fed. 242.

Gifford & Bull (Livingston Gifford, of counsel), for appellant.

J. J. Healey, Jr. (C. L. Sturtevant and Ephraim Banning, of counsel), for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. The opinion below has quoted at great length from the specifications. Since it may fairly be assumed that no one is likely to read this opinion without also examining that of the Circuit Court, those voluminous excerpts need not be repeated here, although in the progress of this discussion it may be necessary to quote many passages from such specifications. There are two groups of claims—those for a process, and those for an apparatus. The subject of discussion may be best introduced by reciting the five process claims which are relied upon as follows:

"(1) The process of purifying sewage, which consists in subjecting the sewage under exclusion of air, of light and of agitation to the action of anaërobic bacteria until the whole mass of solid organic matter contained therein becomes liquefied, and then subjecting the liquid effluent to air and light.

"(2) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow, from light, air, and agitation until a mass or micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, and then subjecting said pool under exclusion of light and air and under a nondisturbing inflow and outflow to the liquefying action of the so-cultivated micro-organisms until the solid organic matter contained in the flowing sewage is dissolved.

"(3) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow, from light, air and agitation until a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, then subjecting said pool under a nondisturbing inflow and outflow and under exclusion of light and air to the liquefying action of the so-cultivated micro-organisms until the solid organic matter contained in the flowing sewage is dissolved, and then subjecting the liquid overflow to an aërating operation.

"(4) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow from light, air and agitation until a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, then subjecting said pool under a nondisturbing inflow and outflow and under exclusion of light and air to the liquefying action of the so-cultivated micro-organisms until the solid organic matter contained in the flowing sewage is dissolved, then subjecting the liquid outflow to an aërating operation, and then to a filtering operation."

"(21) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow from light, air and agitation until a thick scum is formed on the surface thereof and a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, and then subjecting said pool under the cover of said scum and under a nondisturbing inflow and outflow to the liquefying action of the so-cultivated micro-organisms until all the solid matter contained in the flowing sewage is dissolved."

The apparatus for carrying on this process consists of a tank constructed of any suitable material, such as cement-concrete, shallow in comparison with its other dimensions, and in which the "pool of sewage" is located. It may be provided with an air-tight cover, for temporary use only, because after the tank has been in operation for two or three days a peculiar brown scum begins to form at the top and eventually becomes two or three inches thick and serves as an air-tight cover for the sewage. The pool which is secluded in the tank is secured against disturbance from inflow or outflow by having inlet and outlet so located and constructed that the sewage will flow through in a quiet manner. From the tank the effluent passes into an aërator, where it is exposed to the action of the air and afterwards passes on to an ordinary filter bed. By reference to the claims it will be perceived that the second and twenty-first cover only so much of the process as takes place in the secluded pool, the first and third cover also the aërating operation, and the fourth adds the final filtering operation.

To a proper understanding of what the patent shows, it will be nec-

essary to postulate certain definitions. Anaërobes are bacteria (micro-organisms) that are killed by air; they can neither act, multiply, nor even exist in contact with free oxygen. They are also called the germs of putrefaction. Aërobes are bacteria that die without air or oxygen. They are also called the germs of oxidation or of nitrification, and their action is often called decomposition or fermentation. That both these families of bacteria are potent in breaking up the solid parts of sewage matter was a fact long known to those skilled in the art. The patentee introduced a new word to the art—"septic"; he calls his tank a septic tank. Defendant's expert concedes that the term was first used by Cameron, and applied to the tank which he constructed and put in operation at Exeter, England. However this word may have been used subsequently by others, it should, in construing this patent, be given the meaning which the patentee gave to it. Examination of the specification and claims shows that the definition contained in complainant's brief is in accord with them. Septic action is the action of a colony of anaërobes preventing the accumulation of solids, unhampered by the presence of aërobes or oxygen or agitation. The septic tank is the home and workshop of such anaërobic colony, and its structural characteristic, as distinguished from other tanks, includes the roof of septic scum which is built by the anaërobes over the sewage current and remains as a permanent part of the tank.

The essential features of Cameron's process are these: He secures separate and successive action of anaërobes and aërobes on the organic matter of the solids in the flowing current of sewage. He first sets the anaërobes to work under such conditions that whatever aërobes were present in the flowing current as it enters the anaërobes' workshop are quickly destroyed, because without air or oxygen they cannot live, and at the outflow end of his septic tank there is absolutely none; tests mark free oxygen as zero. He cultivates this colony of anaërobes under conditions most favorable for their growth and activity, eliminating light, air, and agitation while the slowly moving current is exposed to their activities. There is some oxygen present when the sewage flows in, although it has all disappeared before it flows out; and the current is not completely at rest, it flows in a quiet manner—were it stagnant, the desired bacterial action would be disturbed and retarded. But there is a substantial absence from the current of oxygen and agitation. A curious result of setting the anaërobes to work under such conditions, after the septic scum has formed, is pointed out in the specifications. "The micro-organisms increase at a fabulous rate, being fed by the incoming solid matter of the sewage until a mass of bacteria is developed sufficient to liquefy substantially all the solid organic matter contained in the sewage passing through the pool: * * * and the outflow is in the form of a liquid without solid particles of sewage * * * The liquefied sewage as it leaves the septic pool has a slight odor, * * * and to relieve it of this slight odor it is subjected to an aërating operation." It is contended by the complainant that such effluent is peculiarly adapted for further treatment on a filter bed.

Thus treated, the colony of bacteria is continually recruited from incoming solid matter, maintaining such numbers as are sufficient at all times quickly to transform the sewage solids and' the wastes of bacterial energy into a liquid effluent. This action is thus described by one of defendant's experts:

"In my opinion from six to eight weeks is required in which the liquefying action will be established to the extent of creating an equilibrium beyond which the solids will not accumulate on the bottom of the tank or on the top thereof; * * * an equilibrium between the accumulated solids in the tank plus those being constantly added thereto by the inflow of the sewage, and the bacterial activities whereby further accumulations are prevented."

Moreover, as the patentee states, "by this invention crude sewage can be treated for long periods without practically any sludge at all forming in the tank." In the plant at Saratoga, which treats sewage by the process above described—infringement of these process claims is not denied in defendant's brief—"the tanks have never been emptied since they were put in service July, 1903, a period of 2½ years, and no solid matter has been taken from them." In consequence this equilibrium between the solids and the solid-destroyers, when once established, need not be disturbed, it will continue indefinitely. Having passed his sewage through the secluded pool, where it was exposed to anaerobic action only, it is areated and then subjected to aerobic action.

It is this method of dividing the process which complainant claims to be novel. Of its essential features the experts for complainant point out that separate action is necessary because the anaerobes cannot successfully act in conjunction with the aerobes, which are inimical to their multiplication and even existence; that successive action is necessary because the anaerobes prepare the organic matter for succeeding purification by the aerobes; that the flowing current is essential, because it makes a continuous process, takes the matter out of the way of the anaerobes as fast as they are through with it, and prevents the formation of toxins which would impair the value of the anaerobic product for the purifying action of aerobes. That the process possesses utility is beyond dispute; it eliminates the problem of removing "sludge," the solid matter which accumulates in the bottom of some sewage tanks and the disposition of which is often troublesome. Moreover, the defendant uses it and thus practically concedes that it is useful.

The process which has been described is the process which the patent indicates. The trial judge, however, reached the conclusion that the statements of the patent constituted a misdescription. He says:

"The patentee declares: 'The invention consists in certain methods of developing in a flowing current of sewage bacteria capable of dissolving the mass of solid organic matter contained therein, and of subsequently utilizing the so-developed bacteria in liquefying the mass of organic matter contained in the flowing current.' If this means what it says, nothing of the kind is done. The bacteria or micro-organisms are not developed in the flowing current of sewage, and cannot be effectually. They are developed in that part of the sewage which is at rest and which has been brought to a 'standstill,' secluded in a pool, and which must remain at a 'standstill' below the flowing current until the bacteria are developed and have actually liquefied it."

In our opinion this is error, and we believe the trial judge was misled by a diagram introduced by the complainant and made quite prominent in the argument. It gave us a misconception of the so-called "septic action" until in the course of the hearing it was corrected by counsel. It is an illustrative diagram showing the Cameron tank, shallow in comparison with its other dimensions, with inlet and outlet arranged so as to avoid agitation; arrows at inlet and outlet mark the direction of the flowing current. It displays shaded portions at top and bottom of the contents of the tank, representing the surface scum and the deposit. Such shaded portions occupy more than one-half the entire depth, and are of about equal thickness at top and bottom. This is wrong, because the evidence shows that the total solids, when condition of equilibrium is established, vary between 20 per cent. and 25 per cent. of the total depth, and the scum is only a few inches in thickness; the total depth being about 8 feet. The diagram further displays a succession of wavy lines from top and bottom towards the center, each terminating in an arrowhead before reaching the center; they would seem to indicate the existence of a neutral zone of flowing current between them, in which whatever action the arrowheaded lines indicate does not take place. The condition of things indicated by this illustrative diagram is in accord with Judge Ray's description above quoted, but is not in accord with the testimony. The evidence as to what takes place in the septic tank of the patent is exceptionally persuasive. It appears that, when Cameron announced his process to the world and built his tank at Exeter to put it in practice, he at once challenged the attention of the art. Sewage experts in England and elsewhere discussed his contribution as a startlingly novel one, and some of them came to Exeter to study its workings. In order to facilitate such study a glass inspection chamber was constructed in the tank, wherein an observer might place himself, and, through its transparent walls with the aid of a lamp, study the process which was going on. One of complainant's experts made observations from such chamber, and has testified to what he saw. Without indicating specific quotations, it may be stated that the conditions within the septic tank are as follows: The deposit consists of a black peaty matter apparently solid at the bottom, but gradually merging to a lighter or more mushy or frothy consistency on the upper strata. The upper surface of the scum is a brown leathery substance, immediately underneath it somewhat resembles axle grease, grading off to a mushy substance beneath. The current flowing between the sludge (deposit) and the scum consists of an already liquid portion in which are suspended particles of organic matter which because of their specific gravity remain suspended in the liquid and flow therewith. In this liquid portion also are particles which are detached by the anaërobic action from the floating or settled solids, and which particles cross the liquid in an interchange from top to bottom, and from bottom to top. The arrowheads in the illustrative diagram indicated these particles, but did not show them crossing the liquid. This interchange is constantly going on, each particle flowing a certain distance with the current at each crossing, each particle being more finely divided at each successive crossing un-

til it is finally merged in the liquid. The expert who had occupied the inspection chamber thus sums up the contention of complainant:

"Every particle of solid organic matter suspended in the liquid current of the septic tank finds itself closely surrounded by anaërobes already cultivated in the scum and sediment and completely at their mercy, because every other influence is excluded by the 'exclusion of light, air, and agitation' which the patent so frequently repeats. Its liquefaction, therefore, does not have to wait for the cultivation of anaërobes, but commences immediately and proceeds with great rapidity. Afterwards the liquefied particles find the aërobes all ready for them in the filter, where they in turn have full sway and oxidize and nitrify them, thus completing the purification. The complete separation of the anaërobic and aërobic actions is still further emphasized in the Cameron process by interposing between them the aërating operation, the action of which is to eliminate all the remaining traces of the anaërobic operation in the septic tank which might interfere with the aërobes."

It is not necessary to cite the evidence which complainant's counsel has collated to show that the action which takes place in the septic tank—"the workshop of the anaërobes"—is correctly set forth in the patent. One of defendant's experts, not incidentally, but in a carefully phrased answer to a specific question, says:

"I believe further that the action [anaërobic] which, as I have stated nearly always in my opinion, has already begun before the solids have reached the tank, is continued in every portion of the tank, both in the surface scum and the bottom deposit and in the liquid contents."

Our attention has been called to nothing in the record which controverts or qualifies this admission in any way, and it must be accepted as true.

The question of anticipation is greatly simplified by a clear understanding of precisely what the Cameron process is. The crux of the question is stated in complainant's brief as follows:

"In all processes of the prior art the aërobic or oxidizing action was continuous from the time the matter left the house as house waste until the end of its purification as sewage. Cameron's separate anaërobic colony was the first break that was ever made in such aërobic action."

It is not disputed that anaërobic action was present to a greater or less extent in prior processes, but it is contended that Cameron was absolutely the first to instruct the art that the problem of removing sludge could be practically eliminated (irrespective of securing other advantages) by providing the anaërobes with a workshop in which they might act upon the solid contents of the flowing current, unhampered by the presence of air, oxygen, agitation, or aërobes. With the question so closely limited, the burden of comparing prior patents and publications with the Cameron process is materially reduced.

The process which, apparently, has been most relied on as an anticipation is that of Louis Mouras, who took out a French patent September 22, 1881 (No. 144,904), an English patent (in the name of W. R. Lake), No. 5,391 of 1881, and a patent in this country November 28, 1882 (No. 268,120). A study of these patents discloses what it was that Mouras contributed to the art. He did not undertake to treat the sewage of a system of sewers at the purification end, but to provide at each individual building a cesspool or scavenger for preparing the house waste before it passes on to the sewer. His tank or scavenger

might be of any form or any kind of material, its inlet and outlet pipes are to be located below the surface of its contents, and the tank hermetically closed so that the outer air cannot enter the tank. The tank does not begin to operate until it is completely full of water. If, then, there is let in through the receiving pipe any volume whatever of water or feces, immediately an equal volume of water is expelled by the discharge pipe; the "discharge pipe never passes anything but turbid water, holding in dissolution [in the English and American patents the phrase is 'holding in suspension or solution'] a certain quantity of matter coming from the decomposition and disaggregation of matter going on at the bottom of the tank." By flushing the tank, as pointed out in a later quotation, it is cleansed without having recourse to the usual means of cleansing. Mouras says nothing about any bacterial action, but undoubtedly there was in his tank, as in all sewage tanks, some anaërobic action going on. That he made no provision, however, for securing conditions favorable to the action of the anaërobes, nor for separating their field of action from that of the aërobes is manifest from the directions he gives as to operation— directions wholly incompatible with the exclusion of oxygen and of agitation upon which Cameron insists. He says:

"For the proper working of the apparatus it is expedient to discharge into the receiving pipe, as much as possible, rainwater and dishwater—in short, all water that can be disposed of—in order to facilitate in the tank the decomposition and disaggregation of feces and all other decomposable matters which may chance to be there. * * * It will happen even in heavy showers that the current occasioned by the falling water will produce an eddy which will make itself felt at a great depth in the tank, and which will expel from it, by the discharge canal, a great quantity of matter in dissolution, so that the cleansing of the tank will be accomplished up to the height of the eddy. [Manifestly this is a macerating process.] Furthermore, if the shower lasts a certain time, nothing but clear water will come out of the discharge pipe."

The tank has been simply flushed out. The promotion of this agitation and formation of eddies is facilitated by Mouras' directions to bring in the inlet pipe perpendicularly. Whether or not the object of this copious supply of water was to supply oxygen, such undoubtedly was its effect. It is not disputed that fresh water brings with it free oxygen. "Dilution," says one of defendant's experts, "consists in bringing the sewage into contact with a sufficient quantity of fresh water so that the dissolved oxygen which such water always contains can promote bacterial action. * * * Up to a certain point, with an admixture of fresh water enough dissolved oxygen is available for the purpose." Elsewhere he says "aërobic fermentation will take place in sewage to the exclusion of anaërobic so long as the supply of oxygen is present." As we have seen, the only bacterial action which oxygen promotes is that of the aërobes; to the anaërobes it is a handicap and, in sufficient quantities, fatal. That oxygen is present in the Mouras tank is further shown by actual tests of tanks built, as defendant admits, according to the teachings of his patent; at their outlets it was found in large and varying quantities, while at the outlet of the Saratoga plant, built according to Cameron's teachings, there was none. The cesspool, therefore, described in the Mouras' patents differs materially from that described by Cameron, since it discloses no workshop

for anaërobes separated from the aërobes, and maintained in anaërobic condition by the careful exclusion of oxygen and agitation.

Besides the three patents above cited, there is a mass of Mouras literature in the record, consisting of the observations of text-book writers and newspaper men upon his apparatus and process. The articles most relied upon in argument are those published in a periodical called "Cosmos" by a French abbé, one F. Moigno, who describes himself as "one of the common herd," quotes from Deuteronomy and two of the Evangelists, and announces the invention of M. Mouras as "a complete solution of the problem, which for centuries had been an insolent menace hurled in the face of all humanity." He conjectures that "in the heart of the scavenger, the great agent of dissolution, of liquefaction, would be hydrosulphate of ammonia or one of its congeners"; or "may it not be the vibriones or anaërobic bacteria which are destroyed by oxygen, and which manifest their destructive activity only in vessels from which the air is excluded?" Of all these publications it is sufficient to say that, so far as they correctly describe the process which Mouras indicated, they point out only a tank in which aërobic action takes place, accompanied in some measure, in the deeper parts of the pool, by anaërobic action. So far as they contain suggestions, which Mouras did not indicate, they are (in the language of the Supreme Court in Seymour v. Osborne, 11 Wall. 555, 15 L. Ed. 557) "mere vague and general representations * * * [not] sufficient to enable those skilled in the art or science to understand the nature and operation of the invention and to carry it into practical use." We find in them nothing to indicate that by changing Mouras' inlet so as to avoid agitation, by eliminating his large influx of fresh water with the eddies and the oxygen which it brought, one could establish a separate workshop for the anaërobes, and by that change modify the Mouras' process with beneficial results. None of them present "an account of a complete and operative invention capable of being put into practical operation" by establishing purely anaërobic conditions in a septic tank and maintaining them till an equilibrium was established which would permit an indefinite retention of the solids. Nor is this conclusion the mere inference of one unskilled in the art. This Mouras literature was published in the early 80's, but no septic tank such as Cameron describes was built until his first experimental structure was set up at Exeter in 1895.

The next reference is to the patents and work of Scott-Moncrief and of Dibdin, which, as complainants admit, are the nearest approach in principle to Cameron's, because they contemplated utilizing anaërobes, and announced that "there is no need for the same amount of oxygen as has hitherto been believed to be necessary." But they fell short of Cameron's process, since they did not provide for having the anaërobes cultivated and worked separately from aërobes, oxygen, and agitation. Two quotations from the Scott-Moncrief United States patent (530,622) are sufficient to demonstrate this statement. "Sludge or deposit (which merely represents that portion of the organic matter which the organisms have not had time to liquefy) * * * may be removed from the concentrating compartment B when required by

simply opening the penstock and raking out or flushing." The agitation resulting from such an operation would destroy the septic conditions, which it takes weeks under the Cameron process to produce, and which if left undisturbed would continue indefinitely. "In order to provide for the * * * aëration of the filtering material without stopping the continuity of the treatment * * * I provide a pumping apparatus as shown at R * * * for forcing air into the liquid contents of the filter at work, * * * so as to supply oxygen to the organisms when necessary or advisable." Dibdin, in his Report to the London County Council, says: "Firstly, the organisms must be supplied with plenty of air." But it is the distinctive teaching of the Cameron process that anaërobic conditions must be maintained in his septic tank, and, since oxygen is fatal to anaërobes, he states in his patent that "it is of the utmost importance that means be provided for preventing contact with the air," while every one of his process claims include a pool secluded from air.

The next reference is to a German patent to Muller (9,792 of 1878). His process is mainly intended for disembarrassing beet-sugar works from liquid waste; he says it may with slight modification be applied even to the treatment of household slops in towns. The only passage in the patent which is at all relevant reads as follows:

"Whereas the former disinfecting methods had for their essential object to obviate as far as practicable any phenomena of putrefaction (corruption or decomposition), the process herein described on the contrary aims at the methodical cultivation of those small 'leavenlike' organisms to the viability of which modern science has traced the so-called 'self-unmixing' processes, namely acidification, fermentation, putrefaction, decay, or the like, in accordance with the rules of physiology, with a view to bringing them into requisition in the task of precipitating out the liquid waste-substances or bringing about their complete mineralization; i. e., reduction to simple inorganic compounds. * * * Only in very few cases will it be necessary to actually sow the seed of these 'leavenlike' organisms; they will mostly develop in simply sufficient quantities from the numberless germs in suspension in the atmosphere which are at all times ready to settle or 'colonize' in a suitable soil, while their growth is further induced by the organic admixtures which are added for the purpose of supplying an adequate proportion of nutritive substances, in the form of meat, blood, glue, gluten, or human excreta," etc.

From the enumeration "acidification, fermentation, putrification, decay, or the like," it is apparent that Muller had in mind both groups of bacteria, for the result of aërobes' activity is fermentation, and the result of anaërobes' activity is putrefaction. Indeed, the last quotation referring to germ colonization with atmospheric surroundings would seem to indicate that it was the aërobes which he expected to colonize. The description of his process is even more vague than the preliminary statement. There are no drawings, but, since he directs the use of three or four basins of at least one meter's depth, provided with a floating top cover of porous material such as straw, etc., it is manifest that his patent did not suggest the establishing of anaërobic conditions in a septic tank.

The English patent to Adeney and Parry (3,312 of 1890) provides for keeping "the liquor [sewage] to be treated under suitable conditions for the rapid multiplication of micro-organisms." But they point out three methods only, one by chemical treatment, the other two

by thorough aëration, for the "purpose and object of developing and multiplying the micro-organisms in the sewage"—which certainly is not Cameron's process.

Besides the patents and literature above referred to, defendant contends that anticipation is found in certain tanks which were built and used for sewage purification in this country prior to Cameron's date of invention. So far as their structural details are concerned, some of them at least closely resembled Cameron's apparatus; having the shallowness in comparison with other dimensions and inlet and outlet so arranged as to reduce the amount of agitation. Without stopping to consider some minor criticisms which complainant's counsel makes on these alleged anticipations, we may dispose of them in two ways. Tests for oxygen were made at all such as were still in operation when the testimony was being taken, with the result that there was found at the outlets free and absorbed oxygen in quantities varying from 24 per cent. to 45 per cent. while at the Saratoga plant, embodying the Cameron process, the record for oxygen at the outlet was zero. It further appears from the testimony that of these tanks those most resembling Cameron's were all cleaned and the sediment on the bottom removed, some of them frequently, some once a month, the one most relied upon "at least seven times per year, and probably oftener." When it is remembered that all the experts on both sides agree that it takes from six weeks to two months to produce the anaërobic conditions which Cameron prescribed for his septic tank, with the scum and deposit of the proper thickness and the condition of equilibrium established which admits of an indefinite retention of the solids, it is quite apparent that these are not Cameron septic tanks; the prescribed conditions are swept away by the hands of the cleaner before they reach practical efficiency. On the contrary, at Saratoga there has been no removal of sludge, and therefore no destruction of septic conditions, for two years and a half.

Reference has been made to opinions in the First Circuit in American Sewage Co. v. City of Pawtucket (C. C.) 132 Fed. 35; Id., 138 Fed. 811, 71 C. C. A. 177; Id., 146 Fed. 753, 77 C. C. A. 234. Inasmuch as that litigation related to a different patent (United States, 559,522, May 5, 1896, to Glover), the validity of which was not disputed, and the record before the courts in the First Circuit was different from the one presented here, we do not find those decisions helpful to a conclusion upon the questions raised in the case at bar.

It is further contended by defendant that these five claims are void because the process they cover "is a process of nature, and one which cannot be covered by any one." As we have seen before, the distinctively novel feature is the septic tank or separate workshop for the microbes. The Circuit Court, influenced as it seems to us by the conclusion which it reached that Mouras and Moigno disclosed all that Cameron claims, decided that the process claims could not be sustained, citing O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601, and other cases. We, however, are satisfied that Cameron was the first one to subject a flowing current of sewage to the action of anaërobes and aërobes under conditions which secured their separate and successive action,

the action of the seggregated anaërobes fitting the effluent for subsequent filtration and aërobic action; and by reason of such careful seggregation he was the first to secure such specified condition in the anaërobic colony that its capacity for its natural work was increased to such an extent that it became capable of disposing of practically all future inflowing sewage that entered its workshop without accumulating such a deposit of sludge as would require removal. This certainly involved "the use of one of the agencies of nature for a practical purpose." Risdon Locomotive Works v. Medart, 158 U. S. 77, 15 Sup. Ct. 745, 39 L. Ed. 899. The process is one which puts a force of nature into a certain specified condition and then uses it in that condition for a practical purpose. Bell Telephone, 126 U. S. 1, 534, 8 Sup. Ct. 778, 31 L. Ed. 863. Within the principles enunciated in the two cases last cited, we are satisfied that Cameron's process as set forth in these five process claims is patentable. Infringement is not disputed.

## The Apparatus Claims.

These are Nos. 5, 6, 7, 8, 11, 12, 20, and 22. Infringement is denied of 6, 7, 8, and 12. It is not necessary to quote them; they are set forth in the opinion of the Circuit Court. Each one of them contains as an element of its combination "a septic tank." Speaking generally and disregarding some minor variations of detail, it may be said that the several structural elements of each combination are old, and that tanks with covers and with inlets and outlets arranged so as to avoid agitation were not broadly new. The contention of the complainant is this: Cameron introduced the word "septic" into the art, he defined it, and it is used in the claims with the meaning he gave it. The septic tank, therefore, of these claims is the septic tank in which the septic scum and deposit are found, in which the eliquilibrium above referred to is established, and in which the solids may be indefinitely retained. This is a peculiar structure, produced in part by the hand of man, in part by the forces of nature. After the labors of the mason, the plumber, and the ironworker are over the microorganisms are set to work, and in the course of from six weeks to two months they add an inside floor and a roof of scum to the masonry structure, whereupon its temporary iron cover may be discarded, and then, for the first, we have the septic tank of the claims. And, because in the prior art there is no masonry (or other) structure which has been thus improved and modified by the action of anaërobic bacteria, this single element of "a septic tank" is sufficiently novel to uphold each combination into which it enters. The question presented is a most curious one; nothing analogous is found in any authority to which we are referred. The argument is ingenious and forceful, but in this case we do not find it convincing. The tank of the apparatus is, as the specifications state, "a suitable tank for carrying out [the] invention," i. e., a tank suitable for the colonization and cultivation of the anaërobes so that they may in time reach the stage of equilibrium with the solids. The apparatus claims were never, in our opinion, intended to cover any tank other than that which Cameron's human workman built. And this opinion is fortified by the following excerpts from the specifications:

"[The sewage] then passes through * * * the inlets into the tank A, in which it may be treated either chemically, bacteriologically, or otherwise, as desired; but it is preferable to treat it bacteriologically."

"The invention also relates to a special form of tank in which a liquid is to be treated for the removal of solid matter by subsidence, flotation, or otherwise. * * * This form of tank is illustrated in Figs. 4, 5, and 6. * * * In the arrangement shown in [these figures] the sewage or other liquid * * * passes into the tanks A, where, as in the previous arrangement, it may be treated either chemically, bacteriologically, or otherwise, as desired."

We concur with the Circuit Judge in his conclusion as to these apparatus claims.

The decree is reversed, without costs, and cause remanded to the Circuit Court with instructions to decree in favor of complainant upon claims 1, 2, 3, 4, and 21, and in favor of defendant as to claims 5, 6, 7, 8, 11, 12, 20, and 22, without costs.

## On Petition for Rehearing.

This petition for rehearing is a re-presentation of propositions advanced upon the original argument. If counsel would bear in mind that it is the practice of the court to examine the briefs and consider the arguments of both sides before announcing its decision, there might be fewer applications for rehearing.

Petition denied.