## LEWIS INVISIBLE STITCH MACH. CO. v. COLUMBIA BLINDSTITCH MACH. MFG. CORPORATION (three cases).

District Court, S. D. New York.

Dec. 17, 1937.

Victor D. Borst, of New York City ·(S. George Tate, of Washington, D. C., of counsel), for plaintiff.

Henry L. Burkitt, of New York City, for defendant.

WOOLSEY, District Judge.

I hold that the single claim of the table patent No. 1,764,573 is invalid as not involving any inventive act over the prior art.

I hold that claims 1, 3, 8, and 10 of the automatic disc patent No. 1,905,291, on which the plaintiff relies in the first cause of action, are valid but not infringed.

I hold that claims 1, 19, 20, 21, and 22 of the automatic disc patent No. 1,989,602, on which the plaintiff relies in the first cause of action, are valid and infringed by what we have called the defendant's earlier disc.

I hold that claims 1 and 19 of the automatic disc patent No. 1,989,602, on which the plaintiff relies in the second cause of action, are valid and infringed by what we have called the defendant's later disc.

In both the first and second causes of action, I find that the defendant has sustained its charge of some unfair competition on the part of the plaintiff.

I hold that in the third suit, involving the Dearborn automatic patent No. 1,964,381, the patent is valid and infringed.

I hold that, balancing the equities on the facts before me, the proper disposition of the matter is to allow the plaintiff the usual injunction against further infringement by the defendant of the claims of the patents which I have found valid and infringed, and to allow the defendant an injunction on the ground of unfair competition as hereinafter indicated, but I will not allow the plaintiff any damages or accounting for profits, and I will not allow the defendant any accounting for damages on its counterclaim for unfair competition.

I hold that neither party shall have costs.

I. These three suits have been tried together most appropriately because they are to a large extent intertwined in their evidence and in their implications. All of them involve the sewing machine art and the subdivision of that art containing what are known as blindstitch sewing machines.

The first case, equity No. 80/86, founded its claim for infringement on three patents, namely, what we have called during the trial the table patent No. 1,764,573, which was issued to Mueller on June 17, 1930, what we have called during the trial the manual disc patent No. 1,905,391, issued to Mueller April 25, 1933, and what we have called during the trial the automatic disc patent No. 1,989,602, issued to Mueller on January 29, 1935.

In the first case there is a counterclaim for unfair competition filed by the defendant, which, after an appeal to the Circuit Court of Appeals on an interlocutory matter which was dismissed, was revamped in pursuance of the dicta contained in the opinion of that court. See Lewis Invisible Stitch Machine Company v. Columbia Blindstitch Machine Manufacturing Corporation, 2 Cir., 80 F.2d 862.

This first suit, equity No. 80/86, was aimed at a device of the defendant which it claims that it no longer makes.

The second suit, equity No. 82/365, is founded on two patents, the so-called table patent, and the so-called automatic disc patent No. 1,989,602. That second suit also contains a counterclaim for unfair competition, similar in essence to the counterclaim in the first case.

The third case, equity No. 83/361, is founded on patent No. 1,964,381, granted to the American Blind Stitch Machine Company as assignee of one Dearborn on July 26, 1934. This patent, which is referred to hereinafter as the Dearborn automatic patent, was purchased as a result of a settlement of a controversy between the American Blind Stitch Machine Company and the Lewis Invisible Stitch Machine Company by an agreement dated the 10th day of September, 1936, which was followed by delivery of an assignment to the Lewis Company by the American Company dated September 9, 1936, which carried with it not only an assignment of the Dearborn automatic patent No. 1,964,381, but also all past claims for damages due to any infringement thereof. It is from this latter clause contained in the assignment that the plaintiff gets its locus standi to sue the defendant for any infringements prior to the date of the assignment, September 9, 1936.

II. The nature of blindstitching and skipstitching has been set forth with his accustomed felicity of phrase by Judge Learned Hand in the case of Buono v. Yankee Maid Dress Corporation, 2 Cir., 77 F.2d 274, at page 275. His description I hereby incorporate at this point by reference.

III. I will now endeavor to give in a brief way what I have gathered from the record of the history of the demand in the trade for what is known as blindstitching and skipstitching.

We were so fortunate as to have the president of the American Blind Stitch Company, Mr. Rivers, testify, and he is a man whose business experience in this trade goes back to the first part of the century and covers, at least for our present purposes, all of the changes therein.

Of course, it was always known that you could blindstitch any material by hand. The great problem in this machine age was to find out some kind of sewing machine that could make blind stitches, and Mr. Rivers states that Mr. Dearborn, who is the inventor for the American Company, was the originator of the blindstitching machine which was first applied to men's clothes, on which, of course, the seams would be thicker than on women's clothes. That was something like 35 to 38 years ago, even before Mr. Rivers had gone into the business.

The first machine which was made by Mr. Dearborn was for sewing the bottom seams of trousers, and by degrees the desire

arose for using blindstitching for thinner material, and as a result people began to use blindstitching machines or to experiment with blindstitching machines, which were intended for heavy work, for work of a more delicate and daintier quality, and began to use them sometimes for women's clothes. For many years, however, the use was principally in men's clothes, and then it began to be used for women's tailored skirts, jackets, and other types of women's clothes, which may fairly be described as suits rather than frocks.

Then by degrees a demand began to arise for the use of blindstitching in light fabrics for women's frocks, like silk dresses, cotton dresses, and so forth.

The pressure of the demand for this was felt, according to Mr. Rivers, about 6 or 8 years ago, or in the beginning of 1929.

The demand for skipstitching became strong, particularly for the bottoms of the skirts of women's frocks, about 4 or 5 years ago, say in 1932 to 1934.

The reason for this was that it was expensive to have skirts hemmed by hand, and the desire was to get a machine which could deal properly with such delicate fabric as silk, rayons, or thin cottons, and succeed in making an anchorstitch and then a skipstitch or an anchorstitch and two skipstitches, which would hold the material and, at the same time, would not show much on the outside of the hem.

Thus a machine-made silk dress would look, at least to the casual observer, much like the handwork of expensive dressmakers, and it was with this in mind, so far as I can make out from the evidence, that the various persons interested in this branch of the needle trade began to get interested in skipstitch mechanism.

There was also a demand for speed in operations, and machines of more refined adjustments were made, and these machines were used for women's wear.

It is against this matrix of commercial demand that I want to approach the consideration of these patents.

IV. Now, we have to focus our attention on the precise matters that are the subject matter of the patents, and I think perhaps I can, without attempting to describe the machines in any detail, say that the actual sewing of these seams is accomplished within what perhaps I might for convenience call the upper and lower jaws of the machines. The upper jaw is made up of a head which carries the needle and, usually, but not always, the feed mechanism, to feed the material through the machine, and a presser-foot.

The lower jaw, which engages with the upper jaw when the machine is operated, contains devices called platens to keep the material pressed up against the presser-foot, sometimes provisions for feeding the material, and always a node or ridge-former to raise the material to the needle. In a slot between the platens is, what I have called throughout the case, a saddle, up into which the ridge-former, which we have called a disc during the trial, operates to raise the material which runs between the saddle and the ridge-former over the platens and under the presser foot.

The needle is arcuate or scimiter-shaped and operates at right angles to the material which is being sewn, and, in most of the high speed machines at least, the needle makes a chain-stitch instead of a lockstitch, which involves the use of a bobbin.

It is obvious that when the actual sewing occurs it is necessary that the material sewn should be held tautly, and this is achieved by the proper timing and cooperation of all the elements that I have mentioned here, the needle, the presser-foot, the platens, and the ridge-former, and also the saddle, which is subject, usually, to the pressure of a spring pressing it down towards the material. The combination of all these devices when properly timed results in what appears to an inexperienced observer like myself extraordinary speed in the feeding of the material. The arcuate needle goes at a regular beat and bites deep into the material when the node-former or disc, as we have called it, is at its high point, and skips some of the material, if skipstitching is desired, when the node-former is at its low point, whether that be in contact with the material or not.

This somewhat sketchy description of a skipstitch sewing machine is made merely for the purpose of focusing attention on the fact that in these patents—the manual disc patent No. 1,905,391 and the automatic disc patent No. 1,989,602—we are concerned with the type and motion of the ridge-former which rises through what I have called the saddle, rises and presses the material through what I have called the saddle.

V. The table patent of Mueller, No. 1,764,573, the single claim of which was embodied in the first two suits, was withdrawn

from consideration at the argument of the case by plaintiff's attorney in view of expressions which I had made as to my inhospitality to it from the point of view of invention, and my belief that it was invalid as an invention over the prior art.

Such an informal method of withdrawing a contention like this could be passed without further notice if it were not for the fact that a patent was involved. Consequently, whilst I appreciate very much the attitude of plaintiff's lawyer in withdrawing it from consideration, and relieving me of at least that much of what I think would have been unnecessary effort, I cannot allow it to be withdrawn. I must hold and do hold the single claim of the table patent No. 1,764,573 invalid in order that there should be a definite disposal of it herein, and in order that it may not hang as a threat over the art. It must be definitely got out of the way.

VI. As is natural in a fast-growing art like this, there has been some litigation.

The United States Blind Stitch Machine Company, together with two brothers named Buono, brought suit against Schifter, the president of the defendant here, and there was a hearing on a preliminary injunction before me in March, 1934, which was inconclusive because before it was decided I became ill.

Then there was a case of Buono v. Yankee Maid Dress Corporation, D.C., 7 F.Supp. 793, decided by Judge Campbell in April, 1934. An appeal was taken from Judge Campbell's decision sustaining the Buono patent No. 1,926,644, and his decision was affirmed as to that patent, but reversed as to the Product patent he sustained for the skipstitch made by the Buono machine, 2 Cir., 77 F.2d 274.

Then in May, 1935, there was a second hearing before me on the case of United States Blind Stitch Machine Company v. Schifter on the preliminary injunction. I denied it on the ground that the defendant Schifter did not infringe the United States patent No. 1,926,644. This same case came on for final hearing before Judge Knox on February 4 to 13, 1936, and was decided by Judge Knox on December 12, 1936, who held—as I had—that there was not any infringement, but did not pass on the validity of the claim in issue, which was claim 6. I mention this litigation merely to show what has happened so far as I am aware

from the point of view of litigation in this art.

There was also an inquest before Judge Byers in which the Lewis Invisible Stitch Machine Company sued a user, named Marlboro Fashions, of the defendant's first type of machine. That case was not defended, although there was an appearance for the defendant and an inquest taken which was the subject of consideration in connection with the unfair competition question with which I shall deal later.

VII. I hold that the manual disc patent No. 1,905,291 is valid but not infringed. In that patent claims 1, 3, 8, and 10, which read as follows, are the foundation of plaintiff's case:

"1. In a sewing machine, the combination with an oscillatory shaft, of a ridge forming element fixed to said shaft and having ridge forming surfaces of different radii arranged in tandem, and means for adjusting said ridge forming element about the longitudinal axis of the shaft to vary the effective height of said element."

"3. In a sewing machine, the combination with an oscillatory shaft, of a ridge forming element fixed to said shaft and having ridge forming concentric surfaces of different radii arranged in tandem, and means for adjusting said ridge forming element about the longitudinal axis of the shaft to vary the effective height of said element."

"8. In a sewing machine, the combination with an oscillatory shaft, of a ridge forming element fixed to said shaft and having ridge forming surfaces of different radii arranged in tandem, a stitch forming mechanism located about said element and including a reciprocatory needle having a fixed path of movement across the element and directly above said shaft, and means for adjusting said element about the longitudinal axis of the shaft to vary the effective distance between the element and the path of needle movement."

"10. In a sewing machine, the combination with an oscillatory shaft, of a ridge forming element fixed to said shaft and having ridge forming concentric surfaces of different radii arranged in tandem, the radius of the rear surface being less than the radius of the front surface, and means for adjusting said ridge forming element about the longitudinal axis of the shaft

710

to vary the effective height of said element."

I think that the question of invention in this patent is nice, and, if it were not for the presumption of validity that attaches to a patent, especially where the same main references to prior art have been before the Patent Office as are before the court, Stevens v. Carl Schmid, Inc., 2 Cir., 73 F.2d 54–56, Ensign Carburetor Company v. Zenith-Detroit Corporation, 2 Cir., 36 F. 2d 684–686, I should have greater difficulty than I even do now in holding the segmental two-step disc of the plaintiff as an advance in the art entitled to the status of invention. But having very carefully considered this matter from every point of view and finding that the defendant's main references thereon are Onderdonk patent No. 872,676 and Whitehall patent No. 1,287,157, which are claimed to anticipate the manual disc patent, I say that you cannot create an anticipation by building up a mosaic, but that to constitute an anticipation you have to have something that is integral in one patent. That is not found in either of these references.

As to the prior art, I think the manual disc patent was the first device with a single disc in which a machine could be used without changing the table height to get anchor stitches or blindstitches. This was achieved by the two diameters of the disc which were arranged, as the claim describes, in tandem on the same disc and which could be changed at will by hand.

Thus you could have a series of anchor stitches and then a series of stitches that did not go as far through as the anchor stitches, and then the whole work could be anchored by further anchor stitches merely by changing the adjustment on the machine.

Now the defendant to be sure took the segmental two-step disc and gave it the tribute of his imitation, and then differentially oscillated it automatically, but it seems to me it cannot be said that by what we have called its first device, in spite of its segmental two-step disc, the defendant was achieving the same result as the manual disc patent, in practically the same fashion, and, therefore, I think that it is not proper to hold that was an infringement.

VIII. Then we turn to the automatic disc patent No. 1,989,602.

The first suit is founded on claims 1, 19, 20, 21 and 22 thereof.

The second suit is founded only on claims 1 and 19.

I hold that, with the table patent now out of the way, all the claims on which the first and second suits are based are valid and infringed.

Therefore, the situation is that Mueller, who was the inventor of the manual disc patent, created a device differentially to oscillate a segmental disc, similar to that of his manual disc patent, so that at one stage of a revolution it occupied one segment of a circle and at another stage another segment of a circle, and in this way provided for skipstitching.

The great question which has troubled me in connection with this part of the case has been the true meaning and effect to attach to claims 1 and 19. I have given to that question a great deal of attention and have come to the conclusion that those claims are valid, and I think they read directly on the defendant's first type of disc. Indeed, I could almost say they confessedly do so, because the defendant discarded using that form of disc and started what has been called their "plunger," which really is another form of disc with arcuate motion. Now anything which has arcuate motion has to travel both horizontally and perpendicularly. This is illustrated by Figure 5 on Exhibit 28, which shows the path of a point on the defendant's second form of disc, and shows it very graphically.

It might be so arranged that the perpendicular element was greater or the horizontal element was greater. That is not material here. But you have to have a combination of these two motions for any particular point on anything that is involved in arcuate motion. Consequently it seems to me that claims 1 and 19 define that. The claims to which I have been referring are as follows:

"1. In a blind stitch sewing machine, an oscillatory ridge-forming disc, means for angularly oscillating said disc for a fixed amount, and means for varying the position of the angular range of movement of said disc during alternate oscillations thereof."

"19. In a blind stitch sewing machine, an oscillatory ridge-forming disc, means for angularly oscillating said disc, and means for varying the position of the angular range of movement of said disc during successive oscillations thereof."

"20. In a blind stitch sewing machine, an oscillatory ridge-forming disc having

high and low peripheral portions arranged in tandem, a reciprocatory needle, means for reciprocating the needle transversely of the disc, and means for oscillating the disc in timed relation to the reciprocations of the needle to thereby present said disc portions periodically to the needle to vary the effective depths of the needle penetrations."

"21. In a sewing machine, the combination with a main shaft, of an oscillatory shaft, a ridge-forming disc fixed thereto and having peripheral surfaces of different radii arranged in tandem, a needle reciprocating above the disc, and driving connections between said shafts for periodically presenting to the needle first one of said surfaces and then the other to thereby vary the effective depths of the needle penetrations."

"22. In a sewing machine, the combination with a main shaft, of an oscillatory shaft, a ridge-forming disc fixed thereto and having peripheral surfaces of different radii arranged in tandem, a needle reciprocating above the disc, and driving connections between said shafts for periodically presenting to the needle first one of said surfaces of the disc and then the other to thereby vary the effective depths of the needle penetrations, said driving connections including a reduction gear and an eccentric driven thereby."

I have been aware of all the criticism which Mr. Burkitt has made with regard to claims 1 and 19, and from the very first they somewhat bothered me, but I have come to the conclusion, on thinking the matter over with the greatest care, that those two claims are perfectly valid general claims covering differential oscillation of a disc.

█ Of course, I am quite aware that the word "disc" is a somewhat unusual word to use for referring to a segment of a circle, but any one can adopt his own nomenclature. Why the patentee adopted the name "disc" for his ridge-former, shown in the drawing as a segment of the circle, I cannot see, for I think some better descriptive word might have been used.

Now, as to the other claims, 20, 21, and 22, they are much more specific claims, and mention different diameters of the disc, and Mr. Burkitt's criticism of those claims is that they do not show and do not imply a differential oscillation of the disc; but I think that such an oscillation is fairly implied from the fact that it is stated that the needle, which we all know is a fixed point, is first presented to one of the surfaces of

the disc and then to the other in order to vary the depth of the needle penetration. The three claims, 20, 21, and 22, in effect march together and are held valid.

As to the defendant's references; Its principal reference is to Mueller's own patents 1,588,132 and 1,715,562, and also to Onderdonk 872,676. In this case again it seems to me that, so far as predicating anticipation is concerned, defendant is trying to do it by patchwork or mosaic, and, indeed, the most important of these references, it seems to me, were passed on by the Patent Office and, therefore, what I said before in connection with the manual disc patent with regard to presumptions would cover this case also. But it seems to me that the differential oscillation of a two-step disc or, indeed, of a disc without two steps, the first of which is permissible under the claims 20, 21, and 22, and the second of which is permissible under the claims 1 and 19, is a real invention.

It seems to me that there really cannot be any question as to infringement either by the defendant's first device, which we have called his earlier disc, or the defendant's second device, which we have called his later disc. In every case there was arcuate motion and differential oscillation.

IX. Now, we turn to what we have called during the trial the Dearborn automatic patent 1,964,381. That was issued on July 26, 1934, and is the basis of the third suit, equity 83/361.

█ The plaintiff, as above observed, gets a locus standi to maintain the action in respect of any damages prior to its ownership of the patent, which was assigned to it as above described, by the specific terms of the assignment.

There is not any counterclaim in this third suit.

█ In effect, this patent is the patent for the linkage of the Dearborn automatic machine, which is a very much simpler mechanical device, with what we have referred to during the trial as the floating pivot, shown in the patent in Figure 4 as No. 68.

I cannot set myself up as sufficiently expert in mechanics to say that there never has been such a form of linkage arranged before. It is quite true, as the defendant contends, that that type of linkage was, as you might say, adumbrated in Mueller's patent No. 1,588,132, and which we have referred to occasionally as the cradle patent

during the trial. The defendant also cites Mueller's patent No. 1,715,562. The floating pivot in Dearborn's case operating with a cam was of the essence of the invention. It was a very much more plastic mechanical device than the eccentric within an eccentric that Mueller had been using in patent No. 1,989,602, although that was not a part of that patent but merely was the means referred to in the claims of achieving the motions of the ridge-former desired. I do not think that defendant's references are sufficient to constitute an anticipation of Dearborn, because neither of them seem to me to be sufficiently like the Dearborn device.

So far as prior art is concerned: To an expert mechanic I suppose it is very difficult to find any mechanical motion that is not known to him, but it is the combination of the mechanical motions that he achieved by his patent No. 1,964,381 that gave Dearborn the status of an inventor. Consequently, I hold that claim 3 of the Dearborn automatic patent is valid.

It reads as follows: "3. In a sewing machine, the combination with a machine frame, a presser foot upon said frame, a driving shaft, suitable stitch forming mechanism, and a spring sustained work support movably mounted upon said frame in operative relation with said presser foot, of an oscillatory shaft mounted on said work support, a ridge forming member carrier by said oscillatory shaft in position to press a rib of work against said presser foot, a rock-arm operatively connected with said oscillatory shaft, means operating said rock-arm from said driving shaft, a floating pivot or journal upon which said rock-arm is mounted, and means operated by said driving shaft for automatically shifting said floating pivot or journal to vary the stitching."

Of course, there is no doubt about the infringement whatever in my opinion because the defendant has used practically exactly the same linkage that Dearborn used to actuate both its earlier and its later disc.

X. Now I turn to the question of unfair competition. I say without any hesitation whatever that I think that the plaintiff was indiscriminate in its broadcasting of its claims to a patent monopoly, and also that it covered territory in which it had no right to such monopoly. By that I refer, of course, to Canada.

Roughly speaking, the notices sent to the trade, whether by the lawyers for the plaintiff or by the plaintiff itself, divide themselves into two epochs, the second of which I think can fairly be begun by the letter which was sent to customers under date of February 18, 1936, enclosing an alleged clipping from the Daily News Record and the Women's Wear Daily.

Mr. Stein, the plaintiff's president, and Mr. Moulton, its general manager, have confessed quite frankly that this was an error, and, of course, we all know by comparison that the alleged article contained in that notice and printed so that it appeared to be an extract from a paper was not actually an extract from either of the papers mentioned. Just how much difference it would have made, if, instead of referring to this as an extract from a paper, it had been merely sent out as a notice, I am a little in doubt. I think, however, that my first impression with regard to the kind of notice that ought to be sent if any attempt is made to broadcast to a trade by a patentee is correct, namely, that the notice should be as specific in its detail as to the number of the patent and the article which it is claimed infringes that patent as a notice on which to found an accounting, e. g., Hazeltine Corporation v. Radio Corporation, D.C., 20 F.Supp. 668, 673.

This is a strict rule, but is what, it seems to me, would be a very fair rule because then you would have a specific claim with which no one could quarrel, because, if you tell a man what is the monopoly that you claim and in what respect it is claimed that he infringes or may infringe that monopoly, I do not see how any unfair competition could be possibly claimed on the basis of the content of the notice.

I do not think I need to go through all these letters because of the disposition I am going to make of this aspect of the situation. Many of them are specific enough to answer my requirement, notably many of those that were sent out by Messrs. Stockbridge & Borst, plaintiff's attorneys.

I think, however, that the Exhibit G-1, which contained the alleged extracts from the Daily News Record and the Women's Wear Daily, was the kind of thing that would be essentially liable to mislead and confuse people who were in this trade, and as I said during the argument it seems to me that it is a very absurd position for a patentee to take, to begin—if I

may so express it—to flap his wings on a decision in an interlocutory matter. Certainly, if he tries to describe that interlocutory decision and uses anything except a full statement of the opinion of the court, he does it at his peril. It seems to me that this alleged quotation here, this extract here, from the newspaper—Exhibit G-1—was the core, so to speak, around which the defendants have wound their claim for unfair competition.

It is perfectly obvious to me that it is quite unfair for a patentee in the United States, who hasn't any Canadian patent, to send circulars to Canadian dealers on his patented article and in this way try to damage—because that is the only object that can be served by it—the defendant's market in another country where the patentee has no monopoly. So here, the Lewis Company has geographically exceeded its monopoly by circularizing in Canada, and it has given, I should think it would be fair to say, a false impression as to the operation of the court in its one interlocutory decision on a question concerned with that monopoly in the United States.

Also, it is to be remembered that the inter-office correspondence between Mr. Stein and his secretary in Chicago and his St. Louis office indicated that the plaintiff was on its toes to get out this notice, Exhibit G-1, as soon as possible and circularize it, I believe the testimony was, among about 12,000 people, of whom a measurable number—it does not appear from the testimony how many—were Canadians.

Now there has been in this cause a cavalcade of witnesses from the needle trade who came in and testified here before me as to the results of that campaign. I think that there was some damage done by it because it must be remembered that the Columbia Blindstitch Company makes not only skipstitch machines and blindstitch machines, but other machines which have been described during the trial, and the effect of a generalized notice given throughout the trade, which I think, having observed the witnesses, do not represent perhaps the highest type of intelligence, would be very apt to cause damage in respect of machines of the Columbia Company which were not, and were not claimed to be, covered by the Lewis patents. The result undoubtedly was, as is shown by the testimony that has been before me, that there were some losses of sales by Columbia.

As I said before, however, I think that those losses have probably been somewhat exaggerated. I think there has been considerable feeling of exasperation between the two companies, and the defendant has perhaps been inclined to regard the plaintiff too much as the devil behind all the troubles it may have encountered in making sales.

I, therefore, hold that there was unfair competition by the plaintiff with the defendant.

XI. Then I am faced with a curious and interesting question which I am going to deal with, I think, in a novel way.

On the one side, whether rightly or wrongly, I have held that two of these patents were valid and infringed. That means that ordinarily speaking I should be granting to the plaintiff an acounting for damages and profits. I am not inclined to take such high ground as the Circuit Court of Appeals took in the case of Art Metal Works v. Abraham & Straus, Inc., 2 Cir., 70 F.2d 641, 642, and say that the situation here is so fraught with evil on the plaintiff's part as to make it necessary for me to refuse to enforce the monopoly which has been granted to them by the executive department of the government when their patents, which I have found to be valid and infringed, were allowed.

But, on the other hand, when a judge sits as I am doing now and tries to balance the equities and see how he should make a decree—because federal equity is a very plastic jurisdiction I am glad to say—how he can fix a decree so that it will do substantial justice between the parties remedially, he will come to the conclusion, as I have done, that it would be practically impossible for the defendant to prove damages on their unfair competition claim. It would be extremely difficult to do it because the chain of causation is difficult to make out, and the type of witness available would not be good; after all, you can only work with what you have to work with, and I think the Columbia Company would never be able to prove the damages I am sure they have incurred.

This, therefore, is what I am going to do in this case, for I think it is about the fairest thing to do. Realizing, on the one hand, that the defendant would have great difficulty in establishing its damages for unfair competition, and realizing at the same time, on the other hand, that the plaintiff has its monopoly; I look at the whole situa-

tion. Now, what I am going to do is to refuse any accounting and damages to the plaintiff because of its acts of unfair competition, but my decision is that the plaintiff may have the usual injunction in all these suits against all further infringement in the future of the claims that I have held valid and infringed.

The defendant may, in the first and second suits wherein the counterclaims were lodged, have an injunction against any future unfair competition by the plaintiff arising out of notices not specifically worded and notices sent into countries where the plaintiff has not any patent monopoly, and against the prosecution of any causes elsewhere pending or to be brought against users of, or dealers in, Columbia infringing machines for an accounting.

It is my idea in deciding the case in the way I have done to have the decrees look entirely in futuro, and, so to speak, to preclude any past damages. I think that the decrees in the first two suits, therefore, may also include an injunction against prosecution by the Lewis Company of any users, dealers, or sellers or other persons in connection with the Columbia machines which have been in litigation here beyond the securing of an injunction.

In other words, I will enjoin the Lewis Company from going further with those suits than an injunction. If it gets an injunction, well and good, because that is what I am giving it here, but it must not get an accounting against any of these users, sellers, and dealers of Columbia machines.

Thus, I will not allow any accounting for damages or profits here or elsewhere either to the plaintiff or the defendant.

By this disposition of these causes the profits, if any, which the defendant may have made out of infringement, or any damage which it may have done to the plaintiff, will be deemed to be balanced off by the damage which the plaintiff has caused the defendant by the nature of its unfair competition, and the respective money claims of the parties will both be allowed to be washed off the slate.

The decree must also provide that the first patent mentioned in the complaints, the table patent No. 1,764,573, is held invalid, so that it will be out of the way entirely and will not be hanging as a threat over the needle trade, and the decree must also provide that there will not be any costs to either party in any of these suits pending before me.

 XII. This opinion shall stand as the findings of fact and conclusions of law required under Equity Rule 70½, title 28 U. S.C.A. following section 723, and on order so providing must be embodied in the decrees which are entered in these suits, e. g., Stelos Company v. Hosiery Motor-Mend Corporation, D.C., 60 F.2d 1009, 1013; Id., 2 Cir., 72 F.2d 405; Id., 295 U.S. 237, 55 S. Ct. 746, 79 L.Ed. 1414.

The decree will be settled on the usual notice.