## DAVISON v. ALEXANDER SMITH & SONS CARPET CO. et al.

District Court, S. D. New York.

Feb. 2, 1938.

Guy G. Gabrielson, of New York City (Arthur E. Paige, of Philadelphia, Pa., of counsel), for plaintiff.

Thomas Ewing, of New York City (Frank C. Cole, of New York City, Frederick A. Tennant, of Boston, Mass., and V.

462

A. Dorsey, of Washington, D. C., of counsel), for defendants.

WOOLSEY, District Judge.

My judgment in this cause is that the complaint must be dismissed with costs to the defendant company, on the ground that the claims on which it is founded are invalid for want of invention, and for lack of novelty by reason of prior use.

The complaint was dismissed without costs as against the defendant Klein at the end of the plaintiff's prima facie case, for lack of proof, and without opposition by the plaintiff.

I. My subject-matter jurisdiction is based on the patent law.

There is not any question of venue, because the defendant company, a corporation of New York State, manufactures its rugs at Yonkers, New York, within this District.

There is not any question of the locus standi of the plaintiff herein, because the suit is by the patentee himself.

There is not any question of the omission of a necessary party herein, because the Hightstown Rug Company, although it is the only licensee of the plaintiff, is not an exclusive licensee, and hence does not need to be joined.

II. The patent involved herein has never been adjudicated.

It is a patent in a very old art—the binding of a cut edge to prevent ravelling—and, consequently, it must be looked at against the background of what such an art always connotes.

The only question which, in my opinion, I need to consider is that of the validity of the patent.

Mr. Davison applied for the patent here in suit on January 11, 1935, and it was granted to him on May 14, 1935, as patent No. 2,001,527. It is described as a patent for "Construction of Rugs of Pile Fabrics." It contains five claims, and in this cause the plaintiff relies only on the first and the fourth.

In the specifications the method by which the patentee says that he escapes from the allegedly wasteful methods of the prior art are as follows:

"It is the present trade practice to charge $1.27½ per yard for binding the cut edge of an Axminster fabric by a method and means which are standard practice in the trade and which consist in allowing one and one-half inches extra length of the fabric at any edge which is to be bound, plucking the pile tufts from that inch and half length and the full width of the fabric, binding the cut edge by the use of a sewing machine which overcasts the cut edge to an extent of about one-half inch with a coarse thread in stitches resembling those used for forming buttonholes. Then bending the plucked portion of the fabric backing backward upon and parallel with the face of the fabric opposite to the tufts, and hemming it to the body of the fabric by a line of machine stitches intermediate of the width of the overcasting. Obviously such a method of procedure is wasteful of the pile material of the fabric and laborious and consequently costly. Moreover, the edge of a fabric thus finished does not lie flat upon a plane surface but is upheld by the thick portion thereof turned under and, consequently, such raised edge of the fabric is subjected to greater wear than the body of the fabric and becomes threadbare."

Further on in the specifications at page 1, column 1, line 46, to page 1, column 2, line 12, the patentee says (paragraphing mine):

(a) " * * * The backing of said web is first coated with elastic cement in strips extending upon the opposite side of each line where the fabric is to be severed to form successive rugs.

(b) "Said strips of cement are then dried and the fabric severed intermediate of each strip to form cut edges of adjoining rugs without raveling either the pile or backing.

(c) "Each cut edge is thereafter overcast to the extent of about one-half inch with a coarse thread, such thread encircling several, say five, of the backing wefts; the inner stitches thereof lying at the roots of the pile tufts.

(d) "The back of the fabric for about one inch from each cut edge thus overcast is then coated with a cement overlying the overcast stitches, and before that cement coating is dried,

(e) "it is covered by a flat band of thin tough material, for instance, a closely woven textile tape which is thus secured to the back of the fabric by the cement, with one edge of said band flush with the cut edge of the fabric so that the fabric thus bound will lie flat upon a plane surface."

In the specifications at page 2, column 1, lines 49 to 60, he gives the composition

of the adhesive which is used to fasten his rienforcing strip to the back of the rug·or carpet to be reinforced as follows:

"Although any suitable adhesive may be employed in the manner above specified, I have found it convenient to employ a mixture of approximately three parts of what is known to the trade as 'filler paste', to wit, a paste formed of flour of grain such as rye boiled in water, mixed with approximately one part of rubber cement, i. e. liquid para gum of the consistency of commercial liquid glue; the mixture forming the preferable elastic adhesive aforesaid, being of that consistency when applied, but capable of setting as quickly as animal glue or grain paste."

The claims herein relied on are claims 1 and 4.

Claim 1 reads as follows (paragraphing mine):

(a) "The method of finishing the cut edge of a pile fabric which includes severing the entire fabric, both backing and pile tufts, without loss of the material of either;

(b) "overcasting ·the backing wefts at and immediately adjoining said cut edge with stitches of thread extending over the backing at the roots of the pile tufts, and encircling said wefts at the back and cut edge of the fabric so as to bind the edge of the fabric and prevent raveling thereof;

(c) "coating the back of the fabric with *elastic* cement overlying said overcast stitches and an adjoining strip of the fabric backing; and

(d) "covering said cement with a flat band of tough material secured parallel with the plane of the fabric by said adhesive and with one edge of said band flush with the cut edge of the fabric."

Claim 4 reads:

"A method as in claim 1, wherein the band is a tape of closely woven textile fabric."

By the evidence given before me, it is shown that the adhesive the plaintiff used is known as an elastic cement which has a rubber base, as distinguished from that which is used by the defendant, which has a gutta-percha base and is thermoplastic.

III. Some of the unadjudicated prior patents in this and cognate arts, which seem to me to show that the plaintiff's claims herein relied on cannot properly be considered to involve invention, are as follows:

A. Patent No. 464,066, granted on December 1, 1891, to Charles H. Foster, as assignor of the Singer Sewing Machine Company of New Jersey, for a work guiding attachment for over-seaming sewing machines, which discloses a sewing machine for serging of the edge of carpets and contains, it seems to me, all the elements of the patent, except the tape with the adhesive on it.

B. The next patent which I think should be looked at in this connection is the patent No. 1,038,095, granted on September 10, 1912, to George H. Davis of Portland, Maine, as assignor of E. T. Burroughs of the same city for a paper carpet, which shows a reinforcement by tapes as disclosed in the patent specification at page 2, lines 40 to 68.

C. Then comes patent No. 1,885,124, granted on November 1, 1932, to Alfred F. McCollum, as assignor to the Magee Carpet Company, of Bloomsburg, Pennsylvania, for a sewing machine which shows in Figs. 2, 4, and 5 the stitches the machine was making, and which illustrates the binding of the edge of a pile fabric with a tape held down by the threads instead of by an adhesive.

D. The next prior art patent, No. 1,-907,728, granted on October 2, 1934, to William M. Moran, as assignor of the Singer Sewing Machine Company for a sewing machine for use on pile carpets, and in Figs. 7, 8, 9, and 10 thereof it shows the use of a mechanical stitch in connection with a tape to bind the cut edge of a pile carpet. The only difference between that patent and the plaintiff's claims is that the tape here is held in position by a stitch at the edge, where it is turned over and comes in contact with the back of the carpet, instead of being held in such position by the adhesive as the plaintiff's patent shows.

It seems to me that when these prior art patents are looked at with care none of them can be described properly speaking as an anticipation of the plaintiff's patent.

Collectively they do not make up an anticipation because an anticipation cannot be created by a process comparable to making a mosaic. But looked at together these patents do constitute the background against which the plaintiff's patent must be read.

I find that this background shows that the plaintiff's patent was rather a step in the evolution of the old art which we have under discussion than an invention, and it was the kind of step by which, rather than

by invention, all arts, especially, as it seems to me, the needle arts, seem largely to have progressed.

IV. Indeed, I think the plaintiff found that he himself was in the midst of what I regard as an evolutionary process when he applied for the patent in suit, No. 2,001,527, on January 11, 1935.

For on August 29, 1934, he had applied under Serial No. 741,978, for a patent—which eventually was granted as patent No. 2,001,381—for the binding of the edges of pile fabrics which involved making, with only the warp threads into which the pile had not been woven, a heading dividing one part of the fabric from another. The method of binding disclosed was to turn back these warp threads and sew them to the back of the carpet, and then cover them with a reinforcement of tape held in place by elastic cement.

On January 11, 1935, the date on which Davison filed his application, Serial No. 1313, which eventuated in the Davison patent, No. 2,001,527, a man named William A. Anderson, of Hightstown, New Jersey, applied, as assignor to Davison, for a patent on an "Apparatus for Binding the Cut Edges of Pile Fabrics." This application had the Serial No. 1,340, and the drawings thereof show that it was apparently an apparatus planned to use the method just described of what became the Davison patent No. 2,001,381, applied for, as noted, under Serial No. 741,978, on August 29, 1934, but not granted at the time of the application for the Anderson patent.

Both Mr. Davison's patents, namely, No. 2,001,527 and No. 2,001,381, were granted on the same day, May 14, 1935, and the Anderson patent was granted later, on December 3, 1935.

It seems perfectly clear to me that Mr. Davison's second patent was merely a good workman's improvement on his first, and even if it were not so regarded by him, at least it is now his customary commercial practice to follow the teaching of his second patent, No. 2,001,527, the result whereby achieved is given the trade-name of a "Fray Proof" method of finishing rugs.

It is here perhaps appropriately observable that, because the application for patent No. 2,001,527, and patent No. 2,001,381, were both made by Mr. Davison,—due to the teachings of Traitel Marble Company v. U. T. Hungerford Brass & Copper Company, 2 Cir., 22 F.2d 259,—I do not rank as prior art Davison's application of August 29, 1934, which eventuated as patent No. 2,001,381, and was copending from January 11, 1935, when the Davison application was made for the patent here involved, No. 2,-001,527, until both Davison's applications matured into patents on May 14, 1935. There seems, however, to be authority which might lead to a contrary conclusion in this Circuit. Cf. Writing Machine Company v. Elliott & Hatch Book-typewriter Company, 2 Cir., 108 F. 628, affirming the decision of Lacombe, J. in, C.C., 106 F. 507.

V. I think perhaps it would be appropriate in this connection to mention the so-called Shanahan rug, which was marked as an exhibit and which is the start, so far as our evidence shows, of another incident of what I regard as the evolutionary process always at work in every well-operated factory.

The Shanahan rug was bound by tape hand sewn to it, and I have had the advantage of having before me in this cause as a witness the woman, Mrs. Ethel Roberts, who actually sewed it, and has herself been making such hand sewn bindings since 1931.

In this type of binding one edge of the tape is placed flush with the cut edge of the carpet to be bound, and by hand attached thereto by an overcast stitch. The tape is then folded both over this stitch and over the cut edge of the carpet and fastened by hand to the back of the carpet by what is called a "whipstitch."

This type of binding, as I understand it, is known as French binding, and is shown as Figure 1 in the Illustrative Charts hereto annexed, and was marked Exhibit T at the trial. It has been used for many years and still is, as was testified, required in contracts with the United States Government. Indeed, I have been told that the rugs in this Court House have all been bound by hand sewing similar to that illustrated by the Shanahan rug and by Exhibit T just mentioned.

The next step forward in this art seems to me to be an obviously evolutionary step. It is to use a serging sewing machine to sew the tape on to the edge of the rug, from whence it was turned back and caught as before to the back of the rug by a hand-made whipstitch, to hold it in position. This process is shown in Figure 2 of the Illustrative Charts hereto annexed, and was marked Exhibit U at the trial.

*Fig.1.*

ILLUSTRATIVE CHART

*Fig.2.*

ILLUSTRATIVE CHART

466

The next step ahead, also merely evolutionary, was to use some sort of adhesive which would hold the tape in place, instead of sewing it to the back of the rug with a whipstitch after it was turned back. This process is illustrated in Figure 3 of the Illustrative Charts hereto annexed, and was marked Exhibit V at the trial.

them fastened by hand sewing as was done in the processes illustrated by the Shanahan rug and shewn in Figures 1 and 2 of the annexed Illustrative Charts.

Beginning about April, 1934, Mr. Barrett made some experiments in binding rugs with labels, and then, as it worked well, he secured samples of adhesive tape from a

Fig. 3.

ILLUSTRATIVE CHART

The way in which an adhesive came to be used in the defendant's factory in place of whipstitching to keep the tape binding in place was as follows:

For some time prior to April 1934, Mr. Barrett, who was a most experienced rug and carpet man, and was the defendant's technical adviser in charge of experimental research and the purchase of new equipment, had been buying, for marking rugs, labels which had on their backs a thermoplastic cement and which were applied to the back of defendant's rugs with a hot electric iron.

These labels were purchased from a firm called the Jackmeyer Company, and it occurred to Mr. Barrett, who is obviously an alert man, that because these labels worked very well, it might be possible for him to use thermoplastic cement to fasten binding tape to the back of rugs in place of having

Mr. Peters, of the Peters Brothers Rubber Company, manufacturers of adhesives, with offices in Brooklyn, New York. After some more experiments in order to determine the thickness of the adhesive desired, and the type of textile which could best be used as a background for the thermoplastic cement, Mr. Barrett succeeded in getting the defendant company to approve his plan, and then the defendant gave its first commercial order for the adhesive tape it now uses for binding rugs. This order was delivered to the company on the 2d or 3d of January, 1936, and this type of binding has been used since then.

When one comes to deal with so simple a matter as binding an unselvaged edge of a bit of woven material, one finds one's self in the zone of the common experience of mankind—or perhaps I should say womankind—and in such a zone to secure

the monopoly of an inventor's status there has to be something startlingly novel in method. Cf. Stelos Company v. Hosiery Motor-Mend Corporation, 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414.

I have mentioned Mr. Barrett's experiments, and their final result, not merely as showing prior art but also as showing the shop practice evolution in the defendant's factory which was going on both before the application for the plaintiff's patents were made and whilst those applications were pending.

■ VI. Owing to my finding of lack of invention, I have further to discuss in this opinion only the prior use shown in the evidence. I might observe here also that, of course, a prior use is part of the prior art, and so supports my finding of lack of invention.

I think it is fair to say that, even when one approaches the evidence given in regard to the prior use referred to with such degree of inhospitality as all evidence of prior use should be approached by the trier of the facts on a patent cause, such prior use is herein established beyond any reasonable doubt whatever, and that it is shown that in the John H. Pray & Sons Company, of Boston, Massachusetts, hereinafter referred to as Pray's—then one of the principal dealers in carpets and rugs at least in New England if not in the whole United States—there was a shop practice, devised, by Mr. Owen A. Eames, beginning in 1893, which long antedates and is almost exactly the same as the practice now claimed as novel by the plaintiff in his patent.

About 1892 or 1893, there was a noticeably increased use of hardwood floors in private houses, especially in those newly built, and these hardwood floors called for rugs rather than carpets that were tacked down from wall to wall as had previously been the usual custom. So Pray's began to make up rugs by sewing carpet together and putting a border around it. This border was mitred at the corners. The demand for this type of rug so assembled increased much, so that by the dates named, 1892 or 1893, Pray's was making as many as fifty rugs a day with borders.

The method followed was to determine the size of the rugs to be made, cut off the necessary number of strips of carpet of proper lengths, sew the strips together by hand and then sew on the border, and where the mitres of the border joined they were also sewn, but it was Pray's custom to sew the mitres as flat as possible and then strengthen them by putting on a piece of tape, about an inch and a quarter in width, over the seam between the mitres on the back of the rug.

When Mr. Eames went to Pray's, these tapes were always stitched by hand. But that was found to be very costly, slow, and difficult on account of the sizing which is always on the back of a carpet. Like any good workman, Mr. Eames, when he went into the workroom, began to try to make improvements in his assembly of these rugs and reduce the cost of producing them.

It occurred to Mr. Eames that if he could find some means of sticking the tape to the back of the rug by adhesive he would save money. He studied the problem for some time and rejected the use of many kinds of glue, cements, and paste because they all required too long a time to dry or set after they were applied. Whilst he was working to effect these improvements in his production, he remembered that tailors used gutta-percha in connection with the manufacture of clothing; so he procured a lot of gutta-percha and tried it out and found it to be very satisfactory, and in a short time he adopted it as the regular method of sticking the tape on to the backs of the mitres.

The method he followed was to cut the gutta-percha into strips the exact width of the tape which he was to use, and then have a sewing woman stitch the gutta-percha to the tape by a single line of thread run down the middle of the gutta-percha and the tape; so that if one examined the binding thus prepared he would see the stitch which bound the gutta-percha to the tape and see that there was gutta-percha on one side and tape on the other.

When the rugs had been prepared to have the binding put on them, women would put the thus assembled gutta-percha and tape, with the gutta-percha side next to the back of the seam of a mitre, and then press the tape with a hot iron so that the gutta-percha was fused with the back of the rug and with the tape. Then, as a precaution, a couple of stitches would be taken at the extreme corners to prevent any risk of their starting to turn there. Then the rug was immediately rolled up and taken away.

When Axminsters were involved—because they were of looser construction—

they were cut very carefully and the edges reinforced at once by a buttonhole stitch put on, at first by hand, and in later times by a sewing machine.

As a kind of by-product of Pray's assembly of rugs with borders of the kind described, there were certain rugs made of remnants of carpet on which there were no borders and which sold much cheaper. These were assembled in the same way as the others by sewing strips of carpet together, and when the ends came to be bound a strip of the binding, above described, with the gutta-percha uppermost was sewn to the raw edge of the carpet with an overcast stitch and then was turned over so as to cover this stitch and the edge of the rug, and then fastened to the back of the rug by a hot iron pressed on just as was the method used in fixing the tape to the mitres.

This is precisely the method of binding a cut edge of a carpet, shown in Figure 3 of the Illustrative Charts annexed hereto, and is substantially like the method followed by the plaintiff patentee; and in so far as it differs in any way therefrom it does not in my opinion involve invention in the slightest degree on the part of the plaintiff.

This shop practice was not secret in any way, but was used from the time Mr. Eames brought it into Pray's about 1893, until some time after he left the workroom at Pray's, about January 31, 1902, to go out as a salesman for the firm.

Mr. Eames is supported in his testimony as to the period during which his process was used and as to the method followed therein, not only by his wife, but by the witnesses Gardner, Mackenzie, and Vaughn.

Mr. Eames says that beginning in the latter part of the nineteenth century the use of rugs thus bound tapered off somewhat because of the advent of mill made rugs which did not require such binding. Indeed, about 1898 this falling off amounted to about 20 per cent., and by 1905 mill-made rugs became so much cheaper that the process of binding by gutta-percha and tape was gradually stopped.

Mrs. Eames, who was a sewing woman at Pray's at the time Mr. Eames was in charge of the workroom, from 1893 until she left to be married at the end of 1896, has made certain sample illustrative exhibits of the method then followed. These have been marked in evidence as Exhibits SSS, TTT, and UUU.

Mr. Eames says that in his earliest days in the rug and carpet business, before he went to Pray's in 1878, and after he went to Pray's, up to 1893, when his shop practice above described was introduced, it had been customary to pluck the pile from the ends of rugs in order to make a header for binding purposes; but due to his shop practice above described, this plucking became no longer necessary, and, even in the case of Axminsters, it was possible to bind the edge by buttonhole stitches, and then add the binder tape of his design.

When it is urged on me, as Mr. Paige has very eloquently done, that I should not find a prior use on the basis of oral testimony only, I think the answer is that the trier of the facts has to consider all the circumstances involved in a prior use including the nature of the goods involved therein.

█ If the things which were made by the prior use claimed, had been things that were permanent in nature, it would be difficult for me to accept oral evidence thereof without the production of contemporaneously made examples illustrating it. But here we have rugs involved, and rugs, especially modern rugs, are intrinsically all more or less ephemeral, and are also subject to the winds of fashion. It seems to me, therefore, that the lack of contemporaneous samples of rugs, bound by Mr. Eames' method, is after the lapse of more than thirty-five years adequately explained by the nature of the goods involved, and, consequently, I do not feel any hesitation whatever as the trier of the facts who has seen the witnesses from Pray's to say that I entirely believe their story, and that I think they have shown beyond peradventure a prior use that—if I had not already found herein lack of invention on the basis of prior art as shown in prior patents—would on that ground have rendered it impossible for me to sustain the validity of the plaintiff's patent.

Indeed, the witnesses from Pray's,—especially Mr. and Mrs. Eames—greatly impressed me, for, to borrow a phrase from the art here under discussion, it is such folk as they that have always hitherto constituted the dependable warp and weft of New England life and thus have given a background of structural strength to its civilization.

It was a privilege to have them before me, and I believe the evidence which they gave.

VII. There are a great many other questions which I could take up in connection with this cause if it seemed worth while to do so, but I think that what I have said indicates sufficiently what my view of the matter is, and covers the ground adequately for any court to which my decision may be destined to be submitted on appeal.

■ This opinion, therefore, shall stand as the findings of fact and conclusions of law required under Equity Rule 70½, 28 U.S. C.A. Section 723, and an order so providing must be embodied in the decree which is entered in this suit dismissing the complaint with costs. Cf. Stelos Company v. Hosiery Motor-Mend Corporation, D.C., 60 F.2d 1009, 1013; Id., 2 Cir., 72 F.2d 405; Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414.

The final decree must also contain a provision dismissing without costs the complaint as against Mr. Klein, the individual defendant, because it is perfectly clear that there was not any proof whatever of any acts of infringement by him outside of the fact that he was the president of the corporate defendant, the alleged infringer.

Unless agreed as to form, the decree may be settled on three days' notice, and costs in favor of the defendant company must, in accordance with my invariable rule, be taxed before the decree is settled, so that the amount thereof may be included in the decree as a money judgment against the plaintiff in the defendant's favor.

VIII. As a footnote to this opinion I have to say that, although Mr. Ewing has repeatedly expressed the desire to have preserved the testimony of the group of witnesses who have testified to the prior use at Pray's above discussed, I have not yet seen an appropriate form of order addressed to that purpose, and if he desires such an order I think that he should make the necessary affidavit to support the granting of such an order, and submit that order, with a certified copy of the said testimony of prior use and any exhibits which he may deem necessary, at the time when the final decree is presented for settlement. Thus there will be in some way a segregation of the Pray's prior use evidence from the other evidence herein that will insure its preservation for use by itself, if needed by the defendant in any subsequent litigation.