## KNAUST BROS., Inc., v. GOLDSCHLAG et al.

District Court, S. D. New York.

June 30, 1939.

As Modified on Denial of Rehearing Aug. 17, 1939.

Kenyon & Kenyon, of New York City (W. Houston Kenyon, of New York City, of counsel), for plaintiff.

Charles Sonnenreich, of New York City (N. Joseph Friedman, of Catskill, N. Y., of counsel), for defendants.

WOOLSEY, District Judge.

I dismiss the complaint herein on the ground that Claims Nos. 1, 2, 3, 4, 7 and 8 of United States Patent No. 2,034,678 are invalid for want of invention.

I grant the prayer of the defendants' counterclaim asking a declaration that all the eight claims of United States Patent No. 2,034,678 and the four claims of United States Patent No. 2,097,766 are invalid for want of invention.

I grant to the defendants taxable costs and all disbursements and allowances of every kind which are taxable.

I. My subject matter jurisdiction in this cause is based on the patent law in respect of the plaintiff's case, and in respect of the defendants' counterclaim, also on the Declaratory Judgement Act, 28 United States Code, Section 400, 28 U.S. C.A. § 400.

There is not any question of venue herein, or of jurisdiction over the persons of the defendants.

II. The original suit is for the infringement of United States Letters Patent No. 2,034,678 for a "Method of Producing

Mushrooms" granted March 17, 1936 to Herman Knaust and Henry Knaust, of West Camp, New York, as assignors of Knaust Brothers, Inc., a New York corporation, of Coxsackie, New York.

The application for this patent was a continuation in part of their co-pending application, having Serial No. 738,118, which had been filed August 2, 1934, for a patent for an "Improvement in Producing Mushrooms."

This application of August 2, 1934, is marked on its file wrapper as "forfeited and abandoned". But it was divided in the Patent Office, and two applications were subsequently filed as offshoots thereof.

The first of these applications was dated January 8, 1936, had Serial No. 581,110, and was the application which eventuated in the above mentioned patent No. 2,034,678.

The second of these applications was filed March 12, 1936, had a Serial No. 68,450, and was the application which eventuated in patent No. 2,097,766 for a "Means of Producing Mushrooms" which was granted to Herman Knaust and Henry Knaust on November 2, 1937, and which has since been assigned to the Knaust Brothers, Inc., the plaintiff corporation referred to above. This second patent is not relied on by the plaintiff and is now only involved in the counter-claim praying that its four claims be declared invalid under the circumstances hereinafter noticed.

III. Under the original bill infringement is herein claimed by the plaintiff of Claims Nos. 1, 2, 3, 4, 7 and 8 of United States Patent No. 2,034,678.

There was a supplementary bill filed to cover infringements of said claims alleged to have occurred after the filing of the original bill.

The defendants' counsel admits that, if the patent were valid, there was infringement subsequent to the filing of the original bill, and I find as a fact that if the patent were valid there was infringement of the claims mentioned before the original bill was filed.

The only question involved on that patent is, therefore, the validity of the claims relied on herein as above stated.

IV. The original bill and the supplemental bill had both been founded at first on an infringement of the claims above mentioned of Patent No. 2,034,678, and of the four claims of Patent No. 2,097,766.

On April 6, 1939, the plaintiff, in a bill of particulars stated that it would not rely on Patent No. 2,097,766 but would rely only on claims 1, 2, 3, 4, 7 and 8 of Patent No. 2,034,678 and omitted claims Nos. 5 and 6. This was approximately three weeks prior to the commencement of the trial of this suit.

At the argument, after the trial thereof, on June 2, 1939, the plaintiff's counsel stated in open Court that he would consent to a decree under the counter-claim holding that there had not been any infringement of Patent No. 2,097,766. But this, of course, does not cover the ambit of the relief desired by the defendants.

■ It seems to me that in the evidence there is not any dissent from the fact that the concept shown in the specifications and claims ·of Patent No. 2,097,766 for a "Means of Producing Mushrooms" was old in the art, namely, that if trays of mycelium are kept dry in a place where the temperature and humidity is low, the growth of the mycelium after casing can be almost indefinitely suspended and started again when it is dampened properly and put in a temperature—circa 55 degrees Fahrenheit—high enough to be hospitable to the growth of mushrooms.

■ I do not think that in the case of a patent, which is a claim of monopoly hanging over a trade, the plaintiff can suddenly, at the last moment, withdraw his claim of infringement and then claim, as the plaintiff's counsel now seeks to do, that the question of the validity has become moot. Lewis Invisible Stitch Machine Co. v. Columbia Blindstitch Machine Mfg. Corp., D.C., 22 F.Supp. 705, 708, 709, and cf. Basevi v. Edward O'Toole Co., D.C., 26 F. Supp. 41, 44, applying the same principle to copyrights.

I think the plaintiff itself created a controversy by asserting the validity of the four claims of that patent and an infringement thereof. Meiniecke v. Eagle Druggist Supply Co., Inc., D.C., 19 F.Supp. 523, 525. Inasmuch as a controversy was thus created by itself, the plaintiff cannot now, having once blown hot, be allowed to blow cold and claim that there was not any controversy.

■ As above observed, there is not any suggestion, I think, in the evidence that Patent No. 2,097,766 disclosed anything which amounted to an invention, and as I hold the claims of Patent No. 2,034,678 relied on by the plaintiff are invalid for lack

of invention and as claims Nos. 5 and 6 thereof are in pari materia with the other claims thereof, I hold that the relief asked by the defendants in their counterclaim of a declaratory judgment that all the claims of both patents are invalid is, for the reasons stated, the proper result of the proceedings herein had.

So to hold, in my opinion, conduces to economy of judicial effort, as Judge Patterson pointed out in a somewhat analogous situation in Leach v. Ross Heater & Manufacturing Company, 2 Cir., 104 F.2d 88, decided April 24, 1939, and—though it does not seem to fall precisely within Rule 41(a) (2) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c—is, I believe, not inconsistent therewith.

V. Turning now to the patent for a "Method of Producing Mushrooms", Patent No. 2,034,678, the state of the art existing at the time when the application was made for that patent is clearly shown by the first two pages of the specifications down to line 40 on the second page.

In that description of the prior art is incorporated by reference Circular No. 251 of the United States Department of Agriculture, published December 1932, entitled "Mushroom Growing in the United States."

VI. The growth of mushrooms and some of the difficulties with which it is fraught may be thus briefly summarized:

A. Mycelium—the matrix of mushrooms—is a low order of natural fungus which must be grown in a compost made of ripened horse manure.

The objective of the mushroom grower is to create a medium and surroundings as hospitable as may be to the growth of that fungus.

B. To create such a medium and such surroundings precautions must be taken to prevent—

(a) Pests, such as the sciarid fly, mites and springtails; and

(b) The various diseases of mushroom of which mycogone or the bubble disease is the most prevalent.

C. The insect pests are prevented or decreased by—

(a) So cleaning the beds or trays in which the mushrooms are to be grown as substantially to sterilize them;

(b) By pasteurizing the compost in which the mycelium is grown by raising it by appropriate use of its own bacterial fermentation, or artificially, up to a temperature of 130 to 140 degrees Fahrenheit which is lethal (1) to the larvae of the sciarid fly, (2) to mites, and (3) to springtails. But the temperature must not be allowed to get much above 140 degrees for that not only badly affects the compost, but encourages a competitive fungus growth called olive mold.

(c) By "dusting", usually with pyrethrum powder—which will kill the insects named—the compost when it is at peak heat in order to reach any insects which may come to the surface of the compost to avoid the heat therein.

(d) After the compost has been pasteurized its temperature is allowed to drop to circa 70 degrees Fahrenheit, which is, as I understand, the optimum temperature for the running of mycelium.

D. When the compost has thus been dropped to circa 70 degrees Fahrenheit mycelium spawn, as it is called, which merely means bits of a mycelium grown under laboratory conditions in a bottle or jar, are sown or pressed into the compost, and then in the course of about three weeks the mycelium will, if the temperature of 70 degrees Fahrenheit is maintained, have permeated the compost and the compost will be ready for casing with loam as a preparation for the growth of mushrooms.

In proportion as the temperature is lower than 70 degrees Fahrenheit, it will take a proportionally longer time for the mycelium to run entirely through the compost.

E. After the mycelium has spread through the bed or the tray, in order to grow mushrooms the compost has to be cased with loam—preferably pasteurized to avoid the development of mushroom diseases, or, at least, secured from a place known to be uncontaminated thereby.

After the mycelium is cased with loam and the growth of the mushrooms is to begin, the loam is dampened and the temperature has to be brought down to circa 55 degrees Fahrenheit for the optimum results so far as speed of growth is concerned. A slightly higher temperature will cause more rapid growth, and a slightly lower temperature will favor slower growth, but the amount of the crop remains about the same within a reasonable range of temperatures.

VII. The change of locale from the place of spawning after the end of the

mycelium run—in order that the growth of the mushrooms may be in a new place—is the inventive concept claimed by the plaintiff. It is called the two-zone method of cultivating mushrooms.

The plaintiff has not added anything new to the technique of growing mushrooms except this change of locale after mycelium has run.

The claims of the Patent No. 2,034,678, on which the plaintiff relies, are as follows:

"1. In the production of mushrooms, the steps which comprise developing the root structure in a body of development-supporting material and in a zone suitable for the development thereof and for the control of parasitic and disease organisms, removing said body and root structure from said zone before mushroom production has commenced, and growing mushrooms from said root structure in a second zone suitable to the growth of mushrooms.

"2. In the production of mushrooms, the steps which comprise developing the root structure in a body of development-supporting material and in a zone suitable for the development thereof and for the control of parasitic and disease organisms, removing said body and root structure from said zone before mushroom production has commenced, covering an exposed surface of said body with a layer of casing material, and growing mushrooms from said root structure in a second zone suitable to the growth of mushrooms.

"3. In the production of mushrooms, the steps which comprise developing the root structure within a body of development-supporting material contained within a transportable container in a locus suitable to such development and to the control of parasitic and disease organisms, removing said container from such locus before mushroom production from said root structure has commenced to permit development of root structure in another container in said locus, and maintaining said first-mentioned container in a separate locus of production under conditions of temperature and moisture conducive to the production of mushrooms.

"4. In the production of mushrooms, the steps which comprise developing the root structure within a body of development-supporting material contained within a transportable container in a locus suitable to such development and to the control of parasitic and disease organisms, removing said container from said locus before mushroom production from said root structure has commenced to permit development of similar root structure in another container in said locus, covering the exposed surface of the development-supporting material in said first-mentioned container with a layer of casing material, and maintaining said first mentioned container in a separate locus of production under conditions of temperature and moisture conducive to the production of mushrooms.

\*    \*    \*    \*    \*    \*

"7. In the production of mushrooms, the steps which comprise inoculating with spawn a bed of development-supporting material supported within a shallow open-top transportable container, maintaining said container and its contents in a mycelium-development zone until mycelium development is substantially complete therein, casing the exposed surface of the contents of said container with soil, advancing said container with its contents substantially undisturbed and before mushroom production has commenced to a mushroom-production zone, and maintaining said container and its contents in said zone while mushrooms are produced therein.

"8. In the production of mushrooms, the steps which comprise inoculating with spawn a bed of development-supporting material supported within a shallow open-top transportable container, maintaining said container and its contents in a mycelium-development zone until mycelium development is substantially complete therein, casing the exposed surface of the contents of said container with soil, advancing said container with its contents substantially undisturbed and before mushroom production has commenced to a mushroom-production zone, and sprinkling the contents of said container with water and maintaining the same at a temperature suitable for the growth of mushrooms."

The patent was apparently originally aimed at a retail trade in trays filled with mycelium which could be shipped in a dormant condition and in which, after it was cased and moistened by the purchaser, mushrooms could be grown. Patent, page 3, lines 29 to 39.

But, of course, the patentee or the assignee of a patent is entitled to use it as it pleases him, with this limitation that in a suit for infringement the use alleged to be infringed must be shown to fall within the

claims thereof. Here the plaintiff's use does fall within the claims.

VIII. The rationale by which the plaintiff thus seeks to impose a patent monopoly on a somewhat ancient art must now be considered.

A. The plaintiff's basis of a claim for invention is put by its counsel on three scientific facts—

1. That the sciarid fly breeds in the spent compost and waste matter consisting of butts and stems of mushrooms usually found at the end of a crop in the neighborhood of most mushroom houses;

2. That the period necessary to produce the fly is shortened by a temperature 70 degrees Fahrenheit and decreased proportionately by lower temperatures.

3. That the rate of propagation of sciarid flies is very rapid on account of the number of eggs which the female lays, usually, I understand, about three hundred.

Thus the plaintiff's alleged invention is claimed really to revolve about the life cycle of the sciarid fly at optimum conditions for its propagation and to help create conditions inhospitable thereto.

B. I find from the evidence that after the eggs of the fly are laid in compost at, say, a temperature of about 70 degrees the egg stage lasts from four to five days.

The eggs then go into the larval stage and become maggots. The larval stage is the only feeding stage when either mycelium or mushrooms are attacked. This stage lasts about ten days.

The larval stage is then succeeded by what is known as the pupal stage when the fly is in a cocoon with its wings forming. This pupal stage lasts three or four days.

Thus the total elapsed time at optimum conditions for its propagation from the laying of the egg to the production of an adult sciarid fly is about 18 to 19 days.

The sciarid fly when fully grown lives for circa 14 days and is merely a means for reproduction of its species. The female fly lays eggs but it does not feed. Both male and female flies are carriers of other insects and of mushroom diseases.

C. Under the plaintiff's commercial practice, the stacking of compost laden trays, which is admittedly not patentable— Patent, page 2, lines 65–71—is said to cut down the period of pasteurization from 7 or 8 days to about 2 to 3 days.

The period of cooling from the peak heat of pasteurization is cut down to about 10 hours, so that spawning can be commenced within a half day of peak heat.

This is partly due to the fact that the thickness of the compost in the trays— which are circa 3 feet long and 2 feet wide —is 5 inches only as against a usual depth of 7 or 8 inches in the long beds of the standard mushroom house.

This shallowness of the compost in the trays results also in a quicker running of the mycelium after spawning because each tray has a smaller cubic content of compost through which the mycelium to penetrate.

The running of the spawn lasts for about 14 to 18 days, making a total of about 18 to 20 days before the trays are ready for removal to the growing locale.

Then the transportation of a group of mycelium filled trays is estimated—somewhat generously I think—to take, at most, about 7 days, depending on the distance from the mycelium running locale to the growing locale.

After a tray is cased with loam it requires at the optimum temperature of 55 degrees Fahrenheit 2 to 2½ weeks—14 to 18 days—for the production of mushrooms to begin.

This makes necessary; for the growth of mushrooms under the plaintiff's practice, using his two zone process, a total elapsed time in all of about 46 days or about 6½ weeks. The elapsed time from spawning to production is about 42 to 43 days.

When production comes the growth of the mushrooms occurs all over the compost in the tray. This growth is called a "break" or "flush". There are usually several of these breaks or flushes in succession, approximately a week or ten days apart.

D. The essence of the matter on the theory of plaintiff's counsel, therefore, is that there is always a race between the production of the mushroom and the propagation of the sciarid fly.

It is claimed that by its patented two zone process, the plaintiff has won the race for the mushrooms, and to this fact it attributes the successful results which it has achieved in recent years.

Under optimum conditions the total elapsed time, as above indicated, from the

laying of the egg in mycelium bearing compost and the production of the adult sciarid fly is expectably 18 to 19 days.

Although conditions of temperature, which are imposed on it or to which it has access, may somewhat increase or decrease its life, the life of the fly thereafter is about 14 days.

This is the fateful fortnight during which eggs are laid by the female fly, and is a period which should be postponed to a time as late as possible in the crop, preferably after the mycelium has run and the temperature has been dropped to 55 degrees Fahrenheit.

For not only do the larvae of the sciarid fly thus laid eat the mycelium and the mushrooms but the adult flies of both sexes are, as above noted, also carriers of other insects, such as mites, at one stage of their development, and of the spores of diseases, particularly a disease called verticillium and possibly also to some extent of mycogone or bubble disease which causes mushrooms to grow in distorted shapes which render them unmerchantable.

The plaintiff has, as noted above, speeded up its production so that it claims a total elapsed time from spawning to production of about 42 to 43 days.

This increased speed of production is due principally, I think, to general improvements in the art in respect of matters hereinafter mentioned.

But on the plaintiff's theory, if pasteurization is thorough and proper dusting occurs all larvae will have been destroyed, and if the mycelium running temperature, 70 degrees Fahrenheit, is dropped to 55 degrees immediately after the mycelium has run, any eggs which have been laid in the mycelium during its run will take such proportionately longer time to produce a sciarid fly as will enable the mushrooms to emerge and, at least the first break to be picked before they, or the mycelium from which they spring, can be damaged by the sciarid fly.

The plaintiff's figures on this race between plant and insect are somewhat inconclusive, I think, except as to any eggs laid near the end of the mycelium running period after which the temperature is dropped and most of the propagation cycle of the fly will be in a temperature inhospitable to it of circa 55 degrees Fahrenheit.

E. There is much mushroom growing in Pennsylvania and in the Hudson River Valley, where the Knausts and the defendants have their plants. In the last few years especially there has been great interest in making experiments which will lead to an improvement in the cultivation of mushrooms, and it is perfectly obvious, as, indeed, Mr. Knaust admitted, that the Knausts have kept abreast of all this general improvement in the art. They seem, indeed, to be in the forefront of it—witness their new plant with its steel built curing house for manure and its surrounding spawning rooms standard in size and provided with the latest arrangements for heating and ventilation.

Among the developments and improvements due to the experiments mentioned that have been suggested to and are getting to be more and more practiced in the mushroom growing industry recently are, for example, increased cleanliness in the neighborhood of mushroom houses; the use of concrete floors for the ripening of the manure; improved ventilation systems; heating systems which enable the achievement not only of a better and quicker heat for the pasteurization of the compost, but also better maintenance of heat for the quick running of the spawn; cooling systems for dropping temperature at the end of spawn running; the realization of the wisdom of not having floor beds because they are difficult adequately to pasteurize; the use of spawn which is grown on a grain base instead of a compost base because it makes the spawn run quicker; and experiments in the acidity and alkalinity of manure by appropriate additions thereto to ensure a better compost which will not only heat up faster for pasteurization but also cause the spawn to run faster, and thus tend to ensure the elimination of any fungi competing with the mycelium.

In a standard long bed mushroom house, after proper pasteurization of the compost and such dusting with pyrethrum powder as may be necessary, if the heat be then dropped to about 70 degrees Fahrenheit and the beds then spawned, and, if, after the mycelium has run, by a cooling system in the house, the temperature thereof be dropped to 55 degrees Fahrenheit for casing and growth, we have a situation parallel to what the plaintiff has achieved when, after the mycelium has run, it moves its trays for casing and growth to a new locale, often quite distant, and in which a temperature—optimum for mushroom growth—of circa 55 degrees Fahrenheit can be maintained.

The plaintiff has, in my opinion, wholly failed to make out what might be called an intrinsic scientific effect due to the removal of the trays after the mycelium has run from the place in which they were spawned to another place for the casing and the growth of the mushrooms. By this I mean that it has not been shown in this cause that this moving results in any novel effect whatever on the development either of the mycelium or the mushrooms. In fact, Styer, an expert for the defendant, testified that such removal would not, in his opinion, in and of itself, have any effect so far as the elimination and control of mushroom diseases was concerned, nor would it have any effect on the elimination or control of insects except insofar as some of them might be eliminated by falling off the trays during the transportation. I believe him, for I think that with the proper prophylactic precautions, as good results can be achieved by a one zone system in a standard mushroom house with modern equipment as the plaintiff obtains by his patented two zone system.

It is abundantly clear that the question of successful growth of mushrooms still remains a question of cleanliness, achieved by keeping the neighborhood of the houses free from the refuse of old crops and thorough disinfection by sterilization of the containers of the compost; by thorough pasteurization of the compost after it is put in the containers, and by the necessary dusting with pyrethrum or other insecticide powder to get rid of stray larvae and insects which are not killed by the pasteurization but merely driven out of the compost thereby.

Indeed, Mr. Knaust himself, as I recollect it, stated that, as its principal recommendation, his double zone method promoted cleanliness and resulted in giving him additional square feet of space for growing mushrooms, although, I believe, he claimed that it also had other advantages.

I am inclined to the opinion that, having regard to the fact that commercial mushroom growing is still in rather an empirical stage, and is being continually improved, it is perhaps difficult to separate the effect, if any, on the plaintiff's production, of his patented two zone method, and the effect thereon of the increase in knowledge of the art of growing mushrooms, based on the experience of growers and the experiments made, and a better use of such knowledge and experience. But the fact that the plaintiff can boast so far of only one licensee tends to indicate that its two zone method has not special appeal to commercial growers of mushrooms.

Although it may be more difficult properly to sterilize fixed beds in the usual method of mushroom growing than it is to sterilize trays in the two zone method, I think that if the beds in a long bed house are thoroughly sterilized before the compost is put in and the properly cured compost is properly pasteurized and the temperatures dropped when they should be, the result of growing mushrooms in a single zone ought to be quite as good as growing them in two zones.

The speeding up in the production achieved by the plaintiff was, therefore, due, I find, to improvements in the art open to all, which the plaintiff applied to trays with diligence and skill.

Of necessity there must always be some "dusting" of the crop with insecticide powder, and, apparently, from the evidence the dusting under the plaintiff's practice is less than that of some others under the one zone system. That, of course, is a commercial advantage in the saving of the expense of insecticide powders and labor, but does not tend to constitute any invention. It does show, however, that the plaintiff is doing a thorough job.

It seems to me quite clear that the plaintiff's commercial success in getting increased production should be attributed rather to new knowledge skillfully applied than to its patented process. Indeed, most of the witnesses whose evidence seemed to me most worthy of consideration were agreed that there had latterly been a great increase in production per square foot of bed throughout the eastern States, and that the plaintiff's increase in production kept pace with that of other well managed mushroom growing plants.

IX. The plaintiff claims invention for this somewhat simple concept—which it calls its two zone process—of moving the trays after the mycelium has run from the place of spawning to a new place for the growth of the mushrooms.

The fact that the concept is so simple does not, of course, in and of itself militate against its inventive quality, e. g. Eibel Process Company v. Paper Company, 261 U. S. 45, 43 S.Ct. 322, 67 L.Ed. 523, but there

are a number of matters hereinabove and hereinafter mentioned which, in my opinion, do militate against invention in this case.

■ A. The question of invention rather than of anticipation is, I think, the first question to decide when the validity of a patent is questioned.

This order of consideration seems to be implicit in the manner in which the Supreme Court dealt not long ago with two patents before it. Cf. Carbice Corporation of America v. American Patents Development Company et al., 283 U.S. 420, 421, 422, 51 S.Ct. 496, 75 L.Ed. 1153, DeForest Radio Company v. General Electric Company, 283 U.S. 664, 685, 686, 51 S.Ct. 563, 75 L.Ed. 1339.

B. Progress in the useful arts is achieved mostly by a process of evolution which means the addition of bits of the experience of one man learned in the art in question to that of others. This I think is notably true where, as here, the growth of plant life is concerned.

Occasionally some one comes along and suggests something that transcends ordinary experience and rises above it, and then we may have an instance of invention.

■ But to have an invention we must have, not merely something new, but something out of the ordinary.

Here we have naught that is new save the concept of moving a tray full of mycelium from the locale in which the mycelium has been run to another locale for casing and the growth of mushrooms therein.

I can see that using trays may make the cleaning of the containers of the compost easier than if fixed beds are used.

I can see that the moving of the trays from the pasteurizing house in which the mycelium is run to a growing house may enable the grower to have more square feet of mycelium for his crop so to have more space for growth and so a larger crop.

But it is my opinion that, as in long beds, when trays are used—

1. That the cleanliness of the containers plus thorough pasteurization of the compost is what achieves the advantage in the control of flies and other insects, and

2. That care in selection of casing soil is what achieves control of disease.

■ I find, therefore, that the two zone concept of the plaintiff was not an invention but was merely an attempt of an intelligent man experienced in mushroom growing—in response to the competition existing with other mushroom growers—to achieve a probably easier and more certain method of control of the hazards of his trade.

I find that this cause shows, therefore, merely another illustration of the process of evolution at work in a useful art. Cf. Less Car Load Lots Co. v. Pennsylvania Railroad Company, D.C., 10 F.Supp. 642, affirmed, 2 Cir., 80 F.2d 1015.

For it seems to me that I cannot properly say that the two zone method is an instance of invention unless I can find some new scientific result due to the removal of the boxes to the second zone, as was true in the use of the second septic tank in Cameron Septic Tank Company v. Village of Saratoga Springs, et al., 2 Cir., 159 F. 453. That I cannot do here.

I think that, so far as the patent is concerned, the old instrumentalities are doing their old jobs at the same temperatures as before and always intrinsically in the same fashion, although those jobs are done in two different places instead of being done in one. Cf. Less Car Load Lots Co. v. Pennsylvania Railroad Company, D.C., 10 F.Supp. 642, affirmed 2 Cir., 80 F.2d 1015.

I think, therefore, that the claims Nos. 1–4 and 7–8 of the defendants' patent No. 2,034,678 are invalid for lack of invention.

I might stop here, but in case the appellate court should differ with me, it might be well to take up the only instance called to my attention which, in my opinion, in any way approached a prior use.

X. Aside from the question of invention, the only strongly contested question herein is whether the testimony from witnesses living in West Leesburg, Pennsylvania, to which we have referred collectively throughout the trial as the Masterone testimony, constitutes a prior use in 1932 and 1933 of the Knaust concept of two zone cultivation, and, if that concept involved invention, would defeat the patent.

The first question here is whether qualitatively the testimony is sufficiently bolstered by contemporaneous documentary evidence to constitute the high degree of proof which is required to establish prior use.

All documentary evidence submitted by the Masterones is inconclusive. It does

not necessarily point to a prior use of the plaintiff's patented method.

Granting that evidence to be true, however, and construing it as favorably as may be to the defendants, it does not carry the defense of prior use far enough.

For though the Masterones pasteurized the boxes in their barn where they could get heat for proper pasteurization of the compost, spawned them there, and then moved them after the mycelium had run to a place in a mine where they could get an optimum temperature for growth, they abandoned this procedure after two years trial. The Masterones never made their procedure public,—as was done for circa ten years, until superseded by improvements in the art, in the case of Davison v. Alexander Smith & Son Carpet Company, D.C., 22 F.Supp. 461, 467, 468, wherein I accepted oral evidence of prior use—and they had not in their minds the concept of the patent which, only when brought to their attention, awoke in them the memory of their sporadic and abandoned experiment in mushroom tray transportation, of the alleged utility of which they had not been contemporaneously aware. Cf. Tilghman v. Proctor, 102 U.S. 707, 711, 26 L.Ed. 279; Pyrene Mfg. Co. v. Boyce, 3 Cir., 292 F. 480, 485, 486; Boyd v. Cherry, C.C., 50 F. 279, 282, 283.

The patent is not defeated, therefore, by the Masterone evidence as a prior use but falls of its own weakness for the reasons hereinabove given.

I should here observe, however, that the existence of this alleged prior use tends to illustrate most graphically the tenuous character of the plaintiff's claim of invention herein, for it may well be asked why should not a man who owns or makes a shallow wooden box put in it what he will, and move it about as and when he wishes. E. g. Less Car Load Lots Co. v. Pennsylvania Railroad Company, D.C., 10 F.Supp. 642, affirmed 2 Cir., 80 F.2d 1015.

XI. Counsel for the defendants must prepare and submit to me through the Clerk's office findings of ultimate facts and the simple conclusions of law herein in pursuance of Rule 52(a) of the Rules of Civil Procedure in accordance with this opinion. I do not want any details of evidence submitted as the findings of ultimate fact.

All proposed findings of fact and conclusions of law submitted to me must be typed in triple spacing so that I may conveniently correct them if I wish to do so.

Counsel for the defendants must give five days' notice of his proposed findings of fact and conclusions of law to counsel for the plaintiff.

Counsel for the plaintiff, if he be so advised, may on the return day of such notice submit to me and serve on the defendants' counsel criticisms of the findings of fact proposed by the defendants' counsel.

As under Rule 52(a) only findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest this course for the plaintiff's counsel because counter findings will not avail him anything. He must take his objections, if any, to my findings by way of appropriate assignments of error on any appeal which he may take.

XII. After the findings of fact and conclusions of law are signed by me, a decree dismissing the complaint granting the prayer of the counterclaim and carrying costs and all taxable disbursements and allowances may be submitted to me through the Clerk's office on the usual notice.